[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 11-14049; 11-14227; 11-14310; 11-14311
_____

D.C. Docket No. 1:10-cr-20196-JLK

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

YIMMI BELLAIZAC-HURTADO,
a.k.a. Fausto,
a.k.a. El Zarco,
a.k.a. El Colorado,
LUIS CARLOS RIASCOS-HURTADO,
PEDRO ANGULO-RODALLEGA,
a.k.a. Pepito,
ALBEIRO GONZALEZ-VALOIS,
a.k.a. Tocayo,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____
(November 6, 2012)

Before BARKETT and PRYOR, Circuit Judges, and BATTEN,[*] District Judge.

PRYOR, Circuit Judge:

This appeal presents a novel issue about the scope of congressional power to proscribe conduct abroad: whether the Maritime Drug Law Enforcement Act, 46 U.S.C. §§ 70503(a), 70506, exceeds the power of Congress to "define and punish . . . Offences against the Law of Nations," U.S. Const. Art. I, § 8, cl. 10, as applied to the drug-trafficking activities of Yimmi Bellaizac-Hurtado, Pedro Felipe Angulo-Rodallega, Albeiro Gonzalez-Valois, and Luis Carlos Riascos-Hurtado in the territorial waters of Panama. Because we conclude that drug trafficking is not an "Offence[] against the Law of Nations" and that Congress cannot constitutionally proscribe the defendants' conduct under the Offences Clause, we vacate their convictions.

## I. BACKGROUND

During a routine patrol of Panamanian waters in 2010, the United States Coast Guard observed a wooden fishing vessel operating without lights and without a flag. The Coast Guard informed the Panamanian National Aero-Naval Service of the vessel. The Panamanian Navy pursued the vessel until its occupants abandoned the vessel and fled into a jungle. When members of the Panamanian Navy searched the vessel the next morning, they discovered approximately 760

[*]Honorable Timothy C. Batten, Sr., United States District Court for the Northern District of Georgia, sitting by designation.

2

kilograms of cocaine. The Panamanian National Frontier Service searched on land for the occupants of the abandoned vessel and arrested Bellaizac-Hurtado, Angulo-Rodallega, Gonzalez-Valois, and Riascos-Hurtado in various locations on the beach and in the jungle. After an exchange of diplomatic notes, the Foreign Ministry of the Republic of Panama consented to the prosecution of the four suspects in the United States.

A federal grand jury indicted Bellaizac-Hurtado, Angulo-Rodallega, Gonzalez-Valois, and Riascos-Hurtado for conspiracy to possess with intent to distribute five kilograms or more of cocaine, and for actual possession with intent to distribute five kilograms or more of cocaine, on board a vessel subject to the jurisdiction of the United States. See 46 U.S.C. §§ 70503(a), 70506; 21 U.S.C. § 960(b)(1)(B). The defendants moved to dismiss the indictment "based upon the lack of jurisdiction and the unconstitutionality of the Maritime Drug Law Enforcement Act as applied to [their] conduct." A magistrate judge recommended that the motion be denied. The magistrate judge reasoned that the district court had jurisdiction because the defendants were operating a stateless vessel and that the Act was constitutional as applied because Congress and several courts had determined that drug trafficking was "universally condemned" by various nations with "reasonably developed" legal systems. The district court adopted the magistrate judge's report. The district court also explained that section 70505 of

3

the Act "limits the actors that have standing to challenge the validity of an MDLEA prosecution on international law grounds."

The defendants conditionally pleaded guilty to the conspiracy charge. The district court sentenced Bellaizac-Hurtado to imprisonment for 90 months, supervised release for five years, and a $100 fine; Angulo-Rodallega to imprisonment for 36 months, supervised release for two years, and a $100 fine; Gonzalez-Valois to imprisonment for 36 months, supervised release for two years, and a $100 fine; and Riascos-Hurtado to imprisonment for 25 months, supervised release for two years, and a $100 fine. The defendants appealed their convictions on the ground that the Act, as applied, exceeded the power of Congress under Article I, Section 8, Clause 10. We consolidated their appeals.

## II.  STANDARD OF REVIEW

"We review de novo the legal question of whether a statute is constitutional." United States v. Tinoco, 304 F.3d 1088, 1099 (11th Cir. 2002).

## III.  DISCUSSION

The United States argues that the Maritime Drug Law Enforcement Act, as applied to the defendants, is a constitutional exercise of the power granted to Congress "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const., Art. I., § 8, cl. 10. The Supreme Court has interpreted that Clause to contain three distinct grants of

4

power: the power to define and punish piracies, the power to define and punish felonies committed on the high seas, and the power to define and punish offenses against the law of nations. See United States v. Smith, 18 U.S. (5 Wheat.) 153, 158–59 (1820). The first two grants of power are not implicated here: piracy is, by definition, robbery on the high seas, United States v. Furlong, 18 U.S. (5 Wheat.) 184, 198 (1820), and the Felonies Clause is textually limited to conduct on the high seas, see U.S. Const., Art. I, § 8, cl. 10. The United States relies instead on the third grant—the Offences Clause—as the source of congressional power to proscribe the defendants' drug trafficking in the territorial waters of Panama. The question whether Congress has the power under the Offences Clause to proscribe drug trafficking in the territorial waters of another nation is an issue of first impression in our Court.

We divide our discussion in two parts. First, we explain why the power of Congress to define and punish conduct under the Offences Clause is limited by customary international law. Second, we explain why drug trafficking is not a violation of customary international law and, as a result, falls outside of the power of Congress under the Offences Clause.

### A. Customary International Law Limits the Power of Congress to Define and Punish Crimes Under the Offences Clause.

The power granted to Congress in the Offences Clause is limited by customary international law for two reasons. First, the related Supreme Court

5

precedent and the text, history, and structure of the Constitution confirm that the power to "define" is limited by the law of nations. Second, the phrase "Offences against the Law of Nations" is understood today to mean violations of customary international law.

1.  The Power of Congress to Define "Offences against the Law of Nations" Is Limited to Established Offenses Against the Law of Nations.

The power to "define" offenses against the law of nations does not grant Congress the authority to punish conduct that is not a violation of the law of nations. The Supreme Court has explained that the power to "define" in Article I, Section 8, Clause 10, is limited by the three specific subjects of the Clause. For example, the Supreme Court has explained that Congress may not define murder as "piracy" to punish it under the Piracies Clause:

> Nor is it any objection to this opinion, that the law declares murder to be piracy. These are things so essentially different in their nature, that not even the omnipotence of legislative power can confound or identify them. Had Congress, in this instance, declared piracy to be murder, the absurdity would have been felt and acknowledged; yet, with a view to the exercise of jurisdiction, it would have been more defensible than the reverse, for, in one case it would restrict the acknowledged scope of its legitimate powers, in the other extend it. If by calling murder piracy, it might assert a jurisdiction over that offence committed by a foreigner in a foreign vessel, what offence might not be brought within their power by the same device? The most offensive interference with the governments of other nations might be defended on the precedent. Upon the whole, I am satisfied that Congress neither intended to punish murder in cases with which they had no right to interfere, nor leave unpunished the crime of piracy in any cases in which they might punish it . . . .

6

Furlong, 18 U.S. (5 Wheat.) at 198.  And, on the issue whether Congress must declare the conduct to be an offense against the law of nations to exercise its power under the Offences Clause, the Supreme Court has explained that "[w]hether the offense as defined is an offense against the law of nations depends on the thing done, not on any declaration to that effect by congress."  United States v. Arjona, 120 U.S. 479, 488, 7 S. Ct. 628, 632 (1887).

This precedent is consistent with the original understanding of the word "define."  During the Founding period, the word "define" meant "[t]o give the definition; to explain a thing by its qualities" and "[t]o circumscribe; to mark limits."  Samuel Johnson, A Dictionary of the English Language, at DEF, DEF (10th ed. 1792); see also Thomas Sheridan, A General Dictionary of the English Language, at DEF, DEF (1780) ("To Define . . . . To give the definition, to explain a thing by its qualities; to circumscribe, to mark the limit.").  These definitions reveal that the word "define" would not have been understood to grant Congress the power to create or declare offenses against the law of nations, but instead to codify and explain offenses that had already been understood as offenses against the law of nations.

The records of the debates at the Constitutional Convention confirm that the Framers also understood the word "define" to be limited by international law.  In an early draft of the clause, Congress would have been given the power "[t]o

7

declare the law and punishment of piracies and felonies &c." 2 Records of the Federal Convention of 1787, at 315 (Max Farrand, ed. 1966). After Gouverneur Morris successfully moved to strike out "declare the law" and insert "punish," James Madison and Edmund Randolph moved to insert the power to "define." Id. at 316. Morris suggested that they should use the word "designate" as opposed to "define" because he felt that "define" was limited to the preexisting meaning of felonies. Id. But the delegates rejected this suggestion and adopted Madison and Randolph's proposal to insert the more limited word "define." Id. About one month later, the delegates considered a new draft of the clause, which granted Congress the power "[t]o define & punish piracies and felonies on the high seas, and 'punish' offences against the law of nations." Id. at 614. Morris moved to strike out "punish" before the offenses provision, so that the offenses could also be definable. Id. Wilson objected on the ground that "[t]o pretend to define the law of nations which depended on the authority of all the Civilized Nations of the World, would have a look of arrogance" and "would make us ridiculous." Id. at 615. Morris responded by noting that "[t]he word define is proper when applied to offences in this case; the law of nations being often too vague and deficient to be a rule." Id. (emphasis omitted). Although this last sentence might suggest that Morris believed that the word define would enable Congress to create offenses not already recognized as contrary to the law of nations, his statement a month earlier

8

that the word "define" would limit the "law of nations" to its preexisting meaning proves otherwise. See J. Andrew Kent, Congress's Under-Appreciated Power to Define and Punish Offenses Against the Law of Nations, 85 Tex. L. Rev. 843, 899 (2007) (explaining that "Morris's desire for prior notice and clear definition sound[ed] in the due process and legality principle concerns that we still have today about vague criminal statutes"). The insertion of the power to "define" enabled Congress to provide notice to the people through codification; it did not enable Congress to create offences that were not recognized by the law of nations.

The structure of the Constitution also confirms the limited power of Congress under the Offences Clause. If Congress could define any conduct as "piracy" or a "felony" or an "offence against the law of nations," its power would be limitless and contrary to our constitutional structure. "The Constitution creates a Federal Government of enumerated powers. As James Madison wrote: 'The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.'" United States v. Lopez, 514 U.S. 549, 552, 115 S. Ct. 1624, 1626 (1995) (citation omitted) (quoting The Federalist No. 45, pp. 292–93 (C. Rossiter ed. 1961)). "The enumeration of powers is also a limitation of powers, because the enumeration presupposes something not enumerated. The Constitution's express conferral of some powers makes clear that it did not grant others. And the Federal

9

Government can exercise only the powers granted to it." Nat'l Fed'n of Indep. Bus. v. Sebelius, __ U.S. __, 132 S. Ct. 2566, 2577 (2012) (internal quotation marks and citation omitted).  For that reason, we must interpret the Clause as consistent with the structure of our government of enumerated powers. See, e.g., United States v. Comstock, -- U.S. --, --, 130 S. Ct. 1949, 1956–58 (2010) (holding that a federal criminal law must, at least, be necessary and proper to the accomplishment of an enumerated power); see also Charles D. Siegal, Deference and Its Dangers: Congress' Power to 'Define . . . Offenses Against the Law of Nations', 21 Vand. J. Transnat'l L. 865, 873–74 (1988) ("Congress possesses some discretion in establishing the boundaries of offenses that are unclear, but Congress may not create offenses where none exist.").  For these reasons, we look to international law to ascertain the scope of power granted to Congress under the Offences Clause.

2.  The Phrase "Offences Against the Law of Nations" Is Synonymous With Violations of Customary International Law.

We and our sister circuits agree that the eighteenth-century phrase, the "law of nations," in contemporary terms, means customary international law. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252 (11th Cir. 2009), abrogated on other grounds by Mohamad v. Palestinian Auth., __ U.S. __, 132 S. Ct. 1702, 1706 & n.2 (2012); Abagninin v. AMVAC Chem. Corp., 545 F.3d 733, 738 (9th Cir. 2008); Flores v. S. Peru Copper Corp., 414 F.3d 233, 237 n.2 (2d Cir. 2003).  And

10

although the Supreme Court has never held that the "law of nations" is synonymous with "customary international law," its decision in Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S. Ct. 2739 (2004), confirms that it is. See id. at 735 (evaluating whether the "prohibition of arbitrary arrest has attained the status of binding customary international law" to determine whether Alvarez could bring a claim under the Alien Tort Statute). These decisions interpreted the Alien Tort Statute, instead of the Offences Clause, but the Alien Tort Statute was enacted by the First Congress and uses the same term of art—"the law of nations"—that is used in the Offences Clause. Given the proximity in time between the writing of these provisions and the substantial overlap between the delegates of the Constitutional Convention and the members of the First Congress, one would expect that the Framers understood the term "the law of nations" in the Offences Clause and the Alien Tort Statute to mean the same thing. The more difficult question involves how to determine whether a crime violates customary international law.

Our Court has referred to customary international law several times, but we have never defined it. See, e.g., Sinaltrainal, 578 F.3d at 1261; Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc., 179 F.3d 1279, 1294–95 (11th Cir. 1999); Abebe-Jira v. Negewo, 72 F.3d 844, 848 (11th Cir. 1996); Garcia-Mir v. Meese, 788 F.2d 1446, 1448 (11th Cir. 1986); United States v. Postal, 589 F.2d 862, 869

11

(5th Cir. 1979). Five of our sister circuits have adopted the definition in the Restatement (Third) of Foreign Relations, which provides that customary international law is the "general and consistent practice of states followed by them from a sense of legal obligation," Restatement (Third) of Foreign Relations § 102(2) (1987). See Aziz v. Alcolac, Inc., 658 F.3d 388, 399 (4th Cir. 2011); United States v. Struckman, 611 F.3d 560, 576 (9th Cir. 2010); Buell v. Mitchell, 274 F.3d 337, 372 (6th Cir. 2001); Sampson v. Federal Republic of Germany, 250 F.3d 1145, 1149 (7th Cir. 2001); Comm. of U.S. Citizens Living in Nicar. v. Reagan, 859 F.2d 929, 940 (D.C. Cir. 1988).

We agree with our sister circuits that customary international law is determined by examining state practice and opinio juris:

> Customary international law . . . consists of two components. First, there must be a general and consistent practice of states. This does not mean that the practice must be universally followed; rather it should reflect wide acceptance among the states particularly involved in the relevant activity. Second, there must be a sense of legal obligation, or opinio juris sive necessitatis. In other words, a practice that is generally followed but which states feel legally free to disregard does not contribute to customary law; rather, there must be a sense of legal obligation. States must follow the practice because they believe it is required by international law, not merely because that they think it is a good idea, or politically useful, or otherwise desirable.

Buell, 274 F.3d at 372 (internal quotation marks and citations omitted); see also Aziz, 658 F.3d at 399; Doe v. Exxon Mobil Corp., 654 F.3d 11, 54 (D.C. Cir. 2011); Swarna v. Al-Awadi, 622 F.3d 123, 144 n.12 (2d Cir. 2010); Struckman,

12

611 F.3d at 576; Sampson, 250 F.3d at 1149.  As evidence of customary international law, we consider "the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat."  See Sosa, 542 U.S. at 734, 124 S. Ct. at 2766–67 (quoting The Paquete Habana, 175 U.S. 677, 700, 20 S. Ct. 290, 299 (1900)).

Private criminal activity will rarely be considered a violation of customary international law because private conduct is unlikely to be a matter of mutual legal concern:

> Matters of "mutual" concern between States are those involving States' actions performed . . . towards or with regard to the other— matters that, as Judge Friendly aptly noted, concern the dealings of States "inter se."  Matters of "several" concern among States are matters in which States are separately and independently interested. Even if certain conduct is universally proscribed by States in their domestic law, that fact is not necessarily significant or relevant for purposes of customary international law. . . . Therefore, for example, murder of one private party by another, universally proscribed by the domestic law of all countries (subject to varying definitions), is not actionable . . . as a violation of customary international law because the nations of the world have not demonstrated that this wrong is of mutual, and not merely several, concern.

Flores, 414 F.3d at 249 (internal quotation marks and citations omitted).

Courts must exercise restraint in defining violations of customary international law because customary international law is, by its nature, difficult to determine:

13

The determination of what offenses violate customary international law . . . is no simple task. Customary international law is discerned from myriad decisions made in numerous and varied international and domestic arenas. Furthermore, the relevant evidence of customary international law is widely dispersed and generally unfamiliar to lawyers and judges. These difficulties are compounded by the fact that customary international law—as the term itself implies—is created by the general customs and practices of nations and therefore does not stem from any single, definitive, readily-identifiable source. All of these characteristics give the body of customary international law a soft indeterminate character that is subject to creative interpretation.

Flores, 414 F.3d at 247–49 (internal quotation marks and citations omitted))); see

Aziz, 658 F.3d at 400 (4th Cir. 2011); Flomo v. Firestone Natural Rubber Co., 643

F.3d 1013, 1015 (7th Cir. 2011).

### B. Because Drug Trafficking Is Not a Violation of Customary International Law, Congress Lacks the Power to Proscribe Drug Trafficking Under the Offences Clause.

The text of the Offences Clause does not resolve the question whether it

limits the power of Congress to define and punish only those violations of

customary international law that were established at the Founding or whether the

power granted under the Clause expands and contracts with changes in customary

international law. The Supreme Court has not resolved the issue in either of the

two cases in which it upheld federal statutes as a constitutional exercise of the

power granted under the Offences Clause. See Ex Parte Quirin, 317 U.S. 1, 27–28,

63 S. Ct. 2, 10–11 (1942); Arjona, 120 U.S. at 488, 7 S. Ct. at 632. In both cases,

the Court explained that the conduct at issue had been condemned as a violation of

14

the law of nations since the time of the Founding.  Scholars have long debated whether the Offences Clause is affected by the later development of customary international law.  See J. Andrew Kent, Congress's Under-Appreciated Power to Define and Punish Offenses Against the Law of Nations, 85 Tex. L. Rev. 843, 847 (2007) ("[B]ecause the Constitution created a government of limited and enumerated powers, it seems potentially problematic that Congress's regulatory powers under the Law of Nations Clause could change or expand as a concomitant of expanding or changing understandings of what today constitutes customary international law or punishable 'offences' against that law."); Charles D. Siegal, Deference and Its Dangers: Congress' Power to 'Define . . . Offenses Against the Law of Nations', 21 Vand. J. Transnat'l L. 865, 869 (1988) ("The limited evidence available suggests that the framers knew that the list of international law offenses would expand with time.  It is doubtful, however, that they anticipated several developments which would undermine the balance implicit in the offenses clause."); Beth Stephens, Federalism and Foreign Affairs: Congress's Power to "Define and Punish . . . Offenses Against the Law of Nations", 42 Wm. & Mary L. Rev. 447, 454 (2000) ("[T]he constitutional language is not limited to the particular international law norms existing at the time the Constitution was ratified, or to any categories indicated by the types of violations recognized in the

15

eighteenth century, but rather evolves over time as international law continues to develop.").

We need not decide whether the power granted to Congress under the Offences Clause changes with the evolution of customary international law because, under either approach, the result is the same. Drug trafficking was not a violation of customary international law at the time of the Founding, and drug trafficking is not a violation of customary international law today.

1. Drug Trafficking Was Not a Violation of the Law of Nations During the Founding Period.

When the Constitution was ratified, the range of conduct that could be viewed as a violation of customary international law was even more limited than it is today. In his Commentaries on the Laws of England, William Blackstone explained that, because offenses against the law of nations are "principally incident to whole states or nations," they "can rarely be the object of the criminal law of any particular state." 4 William Blackstone, Commentaries at *68. As a result, "[t]he principal offences against the law of nations [that could be committed by private individuals and punished criminally] . . . [we]re of three kinds: 1. Violation of safe conducts; 2. Infringement of the rights of ambassadors; and, 3. Piracy." Id.; see also Sosa, 542 U.S. at 715, 124 S. Ct. at 2756. Although the Supreme Court added counterfeiting of foreign currency and violations of the laws of war to this list in Arjona and Ex Parte Quirin, respectively, those norms were also discussed in

16

Vattel's influential treatise on the law of nations from that period. See 120 U.S. at 484, 7 S. Ct. at 630 (quoting Vattel for the principal that sovereigns had a duty to prosecute false coiners); Vattel, Law of Nations § 179 (1797) (explaining that "[s]pies are generally condemned to capital punishment, and with great justice, since we have scarcely any other means of guarding against the mischief they may do us," and citing provisions that describe assassination and poisoning as contrary to the laws of war).

Drug trafficking was not a matter of international concern in 1789, let alone a violation of customary international law. Vattel's Law of Nations contains no references to narcotics, opium, or drug trafficking. And the international community did not even begin its efforts to limit the drug trade until the turn of the twentieth century. As the United Nations Office on Drugs and Crime has observed, "[p]rior to the 1909 Shanghai Opium Commission, national governments and state-sponsored monopolies played an active role in peddling opium across borders. The profits to be made were enormous, generating as much as half of the national revenues of some island states serving as redistribution centres." United Nations Office on Drugs and Crime, A Century of International Drug Control 7, (2008). Because violations of customary international law during the Founding Period were so limited, and narcotics then were not even a subject of international

17

concern, we cannot conclude that drug trafficking was an offense against the law of nations when the Constitution was ratified.

2.   Drug Trafficking Is Not a Violation of Customary International Law Today.

Drug trafficking is also not a violation of contemporary customary international law.  Although a number of specially affected States—States that benefit financially from the drug trade—have ratified treaties that address drug trafficking, they have failed to comply with the requirements of those treaties, and the international community has not treated drug trafficking as a violation of contemporary customary international law.  Scholars also agree that drug trafficking is not a violation of contemporary customary international law.

The United States argues that the widespread ratification of the 1988 United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances establishes that drug trafficking violates a norm of customary international law, but we disagree.  Treaties may constitute evidence of customary international law, but "will only constitute sufficient proof of a norm of customary international law if an overwhelming majority of States have ratified the treaty, and those States uniformly and consistently act in accordance with its principles." Flores, 414 F.3d at 256.  "Of course, States need not be universally successful in implementing the principle in order for a rule of international law to arise. . . . But the principle must be more than merely professed or aspirational." Id. at 248.  And

18

as the International Court of Justice has explained, a customary international law norm will not form if specially affected States have not consented to its development through state practice consistent with the proposed norm. North Sea Continental Shelf Cases (Fed. Republic of Ger. v. Den.; Fed. Republic of Ger. v. Neth.), 1969 I.C.J. 3, 43 (Feb. 20).

The 1988 Convention was ratified by an overwhelming majority of States and currently has 188 States Parties, U.N. Treaty Collection Database, http://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=VI-19&chapter=6&lang=en, but the drug trade continues to flourish in many specially affected States despite their ratification of the Convention. In 2011, the President of the United States designated 21 of these States Parties as "major drug transit or major illicit drug producing countries." Memorandum from Barack Obama, President of the United States, to Hillary Rodham Clinton, Secretary of State (Sept. 15, 2011). And the President described Bolivia, Burma, and Venezuela "as countries that have failed demonstrably during the previous 12 months to make substantial efforts to adhere to their obligations under international counternarcotics agreements." Id. The International Narcotic Control Board—the independent, quasi-judicial body established by the United Nations to monitor compliance with international drug treaties—has reported that drug-related corruption "has increasingly weakened the criminal justice systems in Central

19

America and the Caribbean." International Narcotics Control Board, Report of the International Narcotics Control Board for 2011, at 52, E/INCB/2011/1 (Feb. 28, 2012). The 2011 Report of the Board found that "[c]orruption and limited law enforcement capacity in Central America and the Caribbean have facilitated the use of smuggling channels and drug trafficking activities." Id. The Board also has expressed concern about corruption and lack of progress in reducing illicit opium poppy cultivation in Afghanistan. Id. at 17.

The practice of these specially affected States evidences that drug trafficking is not yet considered a violation of customary international law. Governments corrupted by the interests of drug traffickers are not simply unable to prosecute drug traffickers, but are often unwilling to do so because their economies are dependent upon the drug trade. Cf. United Nations Office on Drugs and Crime, Estimating Illicit Financial Flows Resulting from Drug Trafficking and Other Transnational Organized Crimes: Research Report 65–70 (Oct. 2011) (calculating the gross profits of drug trafficking and allocating those profits to countries in South America and to Afghanistan). The persistent failure of these specially affected States to comply with their treaty obligations suggests that they view the curtailment of drug trafficking as an aspirational goal, not a matter of mutual legal obligation under customary international law.

The international community has also distinguished drug trafficking from established violations of customary international law in its efforts to combat drug trafficking. Comparing the 1988 Drug Convention with the Genocide Convention is instructive. Article 2 of the 1988 Drug Convention described drug trafficking as conduct "having an international dimension." Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, art. 2(1), Dec. 19, 1988, 1582 U.N.T.S. 95, 28 I.L.M. 497. But Article 1 of the Genocide Convention defined genocide as a "crime under international law." Convention on the Prevention and Punishment of the Crime of Genocide, art. 1, Dec. 9, 1948, 78 U.N.T.S. 277, 280. And, unlike genocide, the international community has addressed drug trafficking at the domestic, instead of international, level. The 1988 Drug Convention, for example, relied on domestic enforcement mechanisms to combat drug trafficking and prohibited States Parties from interfering in the domestic enforcement efforts of other States Parties. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, art. 2, art. 3(1), Dec. 19, 1988, 1582 U.N.T.S. 95, 28 I.L.M. 497. By contrast, the Genocide Convention provided for trial by international tribunals, in addition to domestic tribunals, and permitted States Parties to appeal to the United Nations to take further action to prevent and suppress genocide. Convention on the Prevention and Punishment of the Crime of Genocide, art. 6, art. 8, Dec. 9, 1948, 78 U.N.T.S. 277, 280.

21

The drafters of the Rome Statute, which established the International Criminal Court, considered and rejected a proposal to make drug trafficking a crime within the jurisdiction of the court. Johan David Michels, Keeping Dealers Off the Docket: The Perils of Prosecuting Serious Drug-Related Offences at the International Criminal Court, 21 Fla. J. Int'l L. 449, 450 (2009). The negotiators of the Rome Statute repeatedly referred to drug crimes as "treaty crimes" only, in contrast to genocide, war crimes, and crimes against humanity, which are violations of customary international law. U.N. Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, A/CONF.183/2 at 172, 176–78, 278 (June 15-July 17, 1998). And several delegates expressed the opinion that drug crimes "had no place in a statute dealing with international crimes" and should be addressed at the national level. Id. at 271; see id. at 172, 176, 272.

Scholars who have considered the status of drug trafficking in international law agree too that it is not a violation of customary international law. Antonio Cassesse, a noted international criminal law scholar, has explained, for example, that drug trafficking is not an international crime because it is not a crime under customary international law and is not a matter of mutual concern:

> [T]he notion of international crimes does not include illicit traffic in narcotic drugs and psychotrophic substances . . . . For one thing, this broad range of crimes is only provided for in international treaties or resolutions of international organizations, not in customary law. For

22

another, normally it is private individuals or criminal organizations which perpetrate these offences; States fight against them, often by joint official action.  In other words, as a rule these offences are committed against States.  Usually they do not involve States as such or, if they involve State agents, these agents typically act for private gain, perpetrating what national legislation normally regards as ordinary crimes.

Antonio Cassesse, International Criminal Law 24 (2003).  Another scholar has explained that "there is a vast difference between conduct that all nations criminalize and international crimes.  Uniform condemnation and criminalization does not make something an international crime.  Murder and rape, and indeed, most malum in se offenses, are also universally condemned, and all fall outside of international law."  Eugene Kontorovich, Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction Over Drug Crimes, 93 Minn. L. Rev. 1191, 1226 (2009).  The question "whether drug trafficking will and should ever rise to a level of a crime under general customary international law is questionable and remains to be seen."  Claus Kress, The Crime of Aggression Before the First Review of the ICC Statute, 20 Leiden J. Int'l Law 851, 853 & n.8 (2007).

The United States argues that this appeal is controlled by our decision in United States v. Saac, 632 F.3d 1203 (11th Cir. 2011), but we disagree.  In Saac, we considered a constitutional challenge to the Drug Trafficking Vessel Interdiction Act, which provides for the punishment of any person who

23

"knowingly operates . . . or embarks in any submersible vessel or semi-submersible vessel that is without nationality" on the high seas "with the intent to evade detection." 18 U.S.C. § 2285(a). In Saac, we held that Congress had the authority, under the High Seas Clause, to prohibit this conduct. 632 F.3d at 1210–11. We did not hold that drug trafficking was an "Offence against the Law of Nations." Instead, we held that Congress had the authority under the High Seas Clause to punish the operation of these stateless vessels. Saac is inapposite.

Moreover, none of our earlier precedents about the extraterritorial application of our drug trafficking laws have answered the constitutional question presented in this appeal. Indeed, all of the appeals in which we have considered the constitutionality of those laws involved conduct on the high seas. See, e.g., United States v. Ibarguen-Mosquera, 634 F.3d 1370, 1376–77 (11th Cir. 2011); Saac, 632 F.3d at 1209; United States v. Estupinan, 453 F.3d 1336, 1338–39 (11th Cir. 2006); United States v. Rendon, 354 F.3d 1320, 1322–23 (11th Cir. 2003); United States v. McPhee, 336 F.3d 1269, 1271–73 (11th Cir. 2003); United States v. Tinoco, 304 F.3d 1088, 1092–95 (11th Cir. 2002); United States v. Gonzalez, 776 F.2d 931, 933–34 (11th Cir. 1985); United States v. Romero-Galue, 757 F.2d 1147, 1149–51 (11th Cir. 1985); United States v. Marino-Garcia, 679 F.2d 1373, 1377–78 (11th Cir. 1982). Congress possesses additional constitutional authority to restrict conduct on the high seas, including the Piracies Clause, U.S. Const., Art.

24

I, § 8, cl. 10, the Felonies Clause, id., and the admiralty power, United States v. Flores, 289 U.S. 137, 148–49, 53 S. Ct. 580, 582 (1933).  And we have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause.  See Estupinan, 453 F.3d at 1339 ("[W]e readily hold that the district court committed no error in failing to sua sponte rule that Congress exceeded its authority under the Piracies and Felonies Clause in enacting the [Maritime Drug Law Enforcement Act].").  But we have never held that Congress has the power, under the Offences Clause, to apply our drug trafficking laws to conduct in the territorial waters of another State.

Judge Barkett argues in her special concurrence that we should decide this appeal on the ground that drug trafficking is not an offense of universal jurisdiction and, as a result, Congress may not punish the defendants' conduct under the Offences Clause, but that reasoning raises issues that we need not decide.  We need not decide whether the Offences Clause, which makes no mention of the requirements of prescriptive jurisdiction under international law in its grant of power to "define and punish . . . Offences against the Law of Nations," U.S. Const. Art. I, § 8, cl. 10, nevertheless incorporates those jurisdictional principles.  We need not decide whether Congress exempted prosecutions under the Act from any limitations on prescriptive jurisdiction imposed by international law.  See 46 U.S.C. § 70505 ("A person charged with violating section 70503 of this title . . .

25

does not have standing to raise a claim of failure to comply with international law as a basis for a defense. A claim of failure to comply with international law . . . may be made only by a foreign nation. A failure to comply with international law does not divest a court of jurisdiction and is not a defense to a proceeding under this chapter."). We need not decide whether the Constitution imposes any limit on the power of Congress to violate international law. Cf. United States v. Pinto-Mejia, 720 F.2d 248, 259 (2d Cir. 1983) ("[I]n enacting statutes, Congress is not bound by international law. If it chooses to do so, it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law. As long as Congress has expressly indicated its intent to reach such conduct, a United States court would be bound to follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment." (internal quotation marks and citation omitted)). And we need not decide whether international law would permit the exercise of prescriptive jurisdiction by the United States over a stateless vessel in territorial waters when, as here, the sovereign of those waters has consented to that jurisdiction. Cf. United States v. Postal, 589 F.2d 862, 869 (5th Cir. 1979) (explaining that, in territorial waters, "[t]he sovereignty of the coastal state extends into the territorial sea, with the proviso that foreign vessels enjoy the right of innocent passage through it" (citation omitted)); United Nations Convention on the Law of the Sea, art. 17, Dec. 10,

26

1982, 1833 U.N.T.S. 397 (providing that only "ships <u>of all States</u>, whether coastal or land-locked, enjoy the right of innocent passage through the territorial sea" (emphasis added)); Convention on the Territorial Sea and the Contiguous Zone, art. 14, Apr. 29, 1958, 13 U.S.T. 2312, 450 U.N.T.S. 11 (same).

Because drug trafficking is not a violation of customary international law, we hold that Congress exceeded its power, under the Offences Clause, when it proscribed the defendants' conduct in the territorial waters of Panama. And the United States has not offered us any alternative ground upon which the Act could be sustained as constitutional. As applied to these defendants, the Act is unconstitutional, and we must vacate their convictions.

## IV.  CONCLUSION

We **VACATE** the defendants' convictions.

BARKETT, Circuit Judge, specially concurring:

I concur in the majority's conclusion that drug trafficking does not constitute an "Offence[] against the Law of Nations" and agree with much of the majority's opinion. However, my conclusion is based on my view that when conduct has no connection to the United States, such as the conduct at issue here, it can only be punished as an "Offence[] against the Law of Nations" if it is subject to universal jurisdiction.

I agree with the majority that the "Offences against the Law of Nations" Clause must be interpreted in accordance with principles of customary international law. That is to say, customary international law necessarily informs what conduct may be punished as an "Offence[] against the Law of Nations."[1] However, I believe that customary international law contains both a substantive and a jurisdictional component. Thus, when analyzing Congress's authority to proscribe conduct under the Offences Clause in light of customary international law, a court determines both whether the conduct at issue violates a "'norm[ ] of international law'" that is "'well-established' and 'universally recognized,'" Velez v. Sanchez, 693 F.3d 308, 316 (2d Cir. 2012) (internal citation omitted), and

---

[1] The majority questions whether the Constitution imposes any limit on the power of Congress to violate international law. However, Congress may only violate international law to the extent that it is acting within the authority granted to it by the Constitution. In other words, while Congress may violate international law when invoking its authority under other constitutional clauses, it cannot do so when acting under the Offences Clause, which is defined by customary international law. Congress cannot violate international law when the Constitution says that it is bound by international law.

28

whether customary international law provides some basis for the exercise of jurisdiction over that conduct, Hartford Fire Ins. Co. v. California, 509 U.S. 764, 815 (1993) (Scalia, J., dissenting) ("'[T]he law of nations,' or customary international law, includes limitations on a nation's exercise of its jurisdiction to prescribe."). Only conduct that violates a norm of customary international law and is subject to United States jurisdiction under customary international law principles may be prosecuted in United States courts as an "Offence[] against the Law of Nations."[2]

Customary international law recognizes five theories of jurisdiction: territorial, protective, national, passive personality, and universality. See United States v. Benitez, 741 F.2d 1312, 1316 (11th Cir. 1984). The first four theories permit nations to exercise jurisdiction over offenses that implicate domestic interests—that is, offenses that occur within a nation's territory and those that occur outside the territory but have effects within it. In contrast, the universality theory authorizes any nation to exercise jurisdiction over certain offenses, even when no domestic interests are directly implicated. Here, because the drug

---

[2] That is not to say, as the majority seems to suggest, that I consider a failure to comply with jurisdictional principles under international law to be a defense to prosecution under the Maritime Drug Law Enforcement Act ("MDLEA"). See 46 U.S.C. § 70505 ("A claim of failure to comply with international law does not divest a court of jurisdiction and is not a defense to a proceeding under this chapter."). Rather, to the extent that international law is incorporated into the Offences Clause of the Constitution, jurisdictional principles of international law must necessarily be considered in determining whether Congress has the authority to proscribe a defendant's conduct under that Clause.

29

trafficking occurred outside of United States territory and had no direct impact on the interests of the United States, the only potential basis for jurisdiction is the universality principle.[3]

Although the class of offenses that triggers universal jurisdiction has expanded over the last century, the scope of universal jurisdiction remains exceedingly narrow:

> There are two premises underlying universal jurisdiction. The first involves the gravity of the crime. Crimes subject to the universality principle are so threatening to the international community or so heinous in scope and degree that they offend the interest of all humanity, and any state may, as humanity's agent, punish the offender. The second involves the locus delicti (place of the act). Crimes subject to the universality principle occur in territory over which no country has jurisdiction or in situations in which the territorial State and State of the accused's nationality are unlikely to exercise jurisdiction, because, for example, the perpetrators are State authorities or agents of the State.

Michael P. Scharf, Application of Treaty-Based Universal Jurisdiction to Nationals of Non-Party States, 35 New Eng. L. Rev. 363, 368-69 (2001).

---

[3] Conduct can also be punished as an "Offence[] against the Law of Nations" if there is a jurisdictional basis other than universal jurisdiction.  For example, in United States v. Arjona, 120 U.S. 479 (1887), the Supreme Court held that counterfeiting of foreign securities was an "Offence[] against the Law of Nations" where the conduct took place within the United States and the United States, thus, had territorial jurisdiction.  It would be a different scenario if the act of counterfeiting foreign securities, albeit a violation of a norm of international law, had no connection to the United States and occurred in another country.  I do not believe the United States could prosecute it as an "Offence[] against the Law of Nations" without a jurisdictional basis.

The government argues that drug trafficking is an "Offence[] against the Law of Nations" that is subject to universal jurisdiction because Congress, when enacting the MDLEA, stated that drug trafficking is "universally condemned" and is a "threat to the security and societal well-being of the United States[.]" 46 U.S.C. § 70501.  However, it is not Congress's declaration that establishes conduct as subject to universal jurisdiction under customary international law.  Rather, the scope of universal jurisdiction is "ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognising and enforcing that law."  United States v. Smith, 18 U.S. (5 Wheat.) 153, 160-61 (1820); see also Anthony J. Colangelo, The Legal Limits of Universal Jurisdiction, 47 Va. J. Int'l L. 149, 150 (2006) ("If national courts prosecute on grounds of universal jurisdiction, they must use the international legal definitions . . . of the universal crimes they adjudicate; otherwise, their exercise of universal jurisdiction contradicts the very international law upon which it purports to rely.").

Furthermore, universal condemnation is by itself insufficient to place an offense within the scope of universal jurisdiction.  As noted by the Supreme Court in United States v. Furlong, murder may be universally condemned, but it is not subject to universal jurisdiction.  18 U.S. (5 Wheat.) 184, 197 (1820) ("[P]unishing [murder] when committed within the jurisdiction . . . of another nation[] has not

31

been acknowledged as a right, much less an obligation.  It is punishable under the laws of each State . . . .").  For universal jurisdiction to apply to an offense, the international community must reach both a "substantive agreement" that the offense is "universally condemned" and a "procedural agreement that universal jurisdiction exists to prosecute [that offense]."  Sosa v. Alvarez-Machain, 542 U.S. 692, 762 (2004) (Breyer, J., concurring).  Thus, "because universal jurisdiction over a crime is established by international consensus, a state can only invoke universal jurisdiction for those acts that fall within the specific 'subset of [universally condemned] behavior' that the international community has agreed warrants the assertion of universal jurisdiction."  United States v. Hasan, 747 F. Supp. 2d 599, 608 (E.D. Va. 2010).[4]

Drug trafficking does not fall within that subset.  No source of customary international law has designated drug trafficking as being subject to universal jurisdiction.  The academic community is in accord that drug trafficking is not considered a universal jurisdiction offense.  Although "[i]nternational criminal law

_____

[4] I agree with the majority that drug trafficking probably does not violate a norm of customary international law as of yet.  However, I do not believe that this is because the drug trade continues to exist or because some signatories to an international drug treaty have not complied with their obligations under the treaty.  There are undisputed violations of customary international law, such as torture, that also continue to exist and with regard to which countries may not comply with their treaty-based obligations.

However, as explained above, even if drug trafficking were to be considered a violation of a norm of customary international law, I do not believe that the United States would have the authority to prosecute drug trafficking that has no connection to the United States as an "Offence[] against the Law of Nations" because drug trafficking is not subject to universal jurisdiction and no other jurisdictional basis exists.

evidences the existence of twenty-seven crime categories[,]"[5] only the so-called jus cogens crimes of "piracy, slavery and slave-related practices, war crimes, crimes against humanity, genocide, apartheid, and torture" have thus far been identified as supporting universal jurisdiction.  Bassiouni, supra, at 106-09; see also, e.g., Sosa, 542 U.S. at 762 (Breyer, J., concurring) (listing crimes supporting universal jurisdiction to include torture, genocide, crimes against humanity, and war crimes); Restatement (Third) of Foreign Relations Law § 404 (1987) (recognizing that universal jurisdiction applies only to "prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism"); The Princeton Principles on Universal Jurisdiction 48 (Stephen Macedo et al. eds., 2001) (noting that drug crimes "were raised as candidates for inclusion" in the Princeton Principles' list of serious crimes subject

---

[5] These international crimes are:

aggression, genocide, crimes against humanity, war crimes, crimes against the UN and associated personnel, unlawful possession and/or use of weapons, theft of nuclear materials, mercenarism, apartheid, slavery and slave-related practices, torture, unlawful human experimentation, piracy, aircraft hijacking, unlawful acts against civil maritime navigation, unlawful acts against internationally protected persons, taking of civilian hostages, unlawful use of the mail, nuclear terrorism, financing of international terrorism, unlawful traffic in drugs and dangerous substances, destruction and/or theft of national treasures and cultural heritage, unlawful acts against the environment, international traffic in obscene materials, falsification and counterfeiting of currency, unlawful interference with submarine cables, and bribery of foreign public officials.

M. Cherif Bassiouni, Universal Jurisdiction for International Crimes: Historical Perspectives and Contemporary Practice, 42 Va. J. Int'l L. 81, 107 (2001).

to universal jurisdiction, but ultimately were not selected); Anne H. Geraghty, Universal Jurisdiction and Drug Trafficking: A Tool for Fighting One of the World's Most Pervasive Problems, 16 Fla. J. Int'l L. 371, 372 (2004) (explaining that the idea of utilizing universal jurisdiction as a tool for prosecuting drug trafficking has never been "widely embraced"); Christina E. Sorensen, Drug Trafficking on the High Seas: A Move Toward Universal Jurisdiction Under International Law, 4 Emory Int'l L. Rev. 207, 208 (1990) ("Drug trafficking is . . . not subject to universal jurisdiction.").

Nor are there any judicial decisions recognizing Congress's authority to punish drug trafficking that has no connection to the United States as an "Offence[] against the Law of Nations." Indeed, several courts of appeals have held that drug trafficking is not a universal jurisdiction offense, albeit discussing drug trafficking as an offense occurring on the "high Seas" rather than as an "Offence[] against the Law of Nations." See, e.g., United States v. Perlaza, 439 F.3d 1149, 1161-63 (9th Cir. 2006) (rejecting the government's argument that it had jurisdiction over drug trafficking conducted on a go-fast vessel under the principle of universal jurisdiction); United States v. Wright-Barker, 784 F.2d 161, 168 n.5 (3d Cir. 1986) ("[I]nternational agreements have yet to recognize drug smuggling . . . as a heinous crime subject to universal jurisdiction."). Nor have we been able to find any case

34

decided by any international court defining drug trafficking as an offense subject to universal jurisdiction.

Because the drug trafficking at issue here is not subject to universal jurisdiction and no other internationally recognized jurisdictional basis applies, Congress does not have the authority to proscribe these defendants' conduct under Article I, Section 8, Clause 10 of the Constitution. The government's argument that this authority can be supplied by another nation's consent to United States jurisdiction is without merit. As Judge Torruella illustrates in United States v. Cardales-Luna, accepting this argument leads to absurd results:

> Perhaps an even more relevant example would be if Congress passed legislation attempting to apply the criminal laws of the United States, with the Bolivian government's consent, to the conduct of Colombian nationals in Bolivia traveling over its mountain roads carrying a load of coca leaves destined for Peru. The power of Congress to legislate in such a case cannot be countenanced even with the consent of Bolivia, whose consent is ultimately irrelevant, for Bolivia cannot grant Congress powers beyond those allotted to it by the Constitution.

632 F.3d 731, 741 (1st Cir. 2011) (Torruella, J., dissenting).

35