JORDAN, Circuit Judge, dissenting.
 

 This appeal presents an interesting case study for originalism, a set of related theories which (broadly speaking) call for constitutional provisions to be interpreted in accord with their understanding and meaning at the time of enactment or in accord with the intent of their framers.
 
 See, e.g.,
 

 McDonald v. City of Chicago
 
 ,
 
 561 U.S. 742
 
 , 813-38,
 
 130 S.Ct. 3020
 
 ,
 
 177 L.Ed.2d 894
 
 (2010) (Thomas, J., concurring in part and concurring in the judgment); Randy Barnett,
 
 The Original Meaning of the Commerce Clause
 
 ,
 
 68 U. Chi. L. Rev. 101
 
 , 105-08 (2001) ; Edwin Meese, III, Speech Before the American Bar Association on July 9, 1985, in Steven Calabresi, Originalism: A Quarter-Century of Debate 53-54 (2007); Antonin Scalia, A Matter of Interpretation 38 (1997); Robert H. Bork, The Tempting of America: The Political Seduction of the Law 144 (1990); Raoul Berger, Government by Judiciary: The Transformation of the Fourteenth Amendment 363-73 (1977). I write separately to discuss the majority's failure to address, in any meaningful way, Mr. Johnson's originalist argument for limiting the reach of
 
 Terry v. Ohio
 
 ,
 
 392 U.S. 1
 
 ,
 
 88 S.Ct. 1868
 
 ,
 
 20 L.Ed.2d 889
 
 (1968).
 

 * * * * * * *
 

 A quarter century ago, Justice Scalia concluded that the "frisk" aspect of
 
 Terry
 
 , 392 U.S. at 25-27,
 
 88 S.Ct. 1868
 
 -which allows the police to conduct pat-downs for weapons based only on reasonable suspicion-could not be justified on originalist grounds.
 
 See
 

 Minnesota v. Dickerson,
 

 508 U.S. 366
 
 , 381,
 
 113 S.Ct. 2130
 
 ,
 
 124 L.Ed.2d 334
 
 (1993) (Scalia, J., concurring) (finding "no English authority" and "no clear support at common law" for physical searches of suspects absent probable cause). Some subsequent scholarship appears to validate Justice Scalia's view.
 
 See, e.g.,
 
 Thomas K. Clancy, The Fourth Amendment: Its History and Interpretation 40-41 (2d ed. 2014) (asserting that in America and England during the period preceding the American Revolution, "[w]arrantless searches and seizures were virtually nonexistent or at least uncontroversial," and "[o]nly one type of warrantless seizure may have been common, that is, the arrest of a suspected felon"); Heather Winter,
 
 Resurrecting the "Dead Hand" of the Common Law Rule of
 

 1789: Why
 
 Terry v. Ohio
 
 is in Jeopardy
 
 ,
 
 42 Crim. L. Bull. 564
 
 , 565 (2006) ("The historical evidence reveals that
 
 Terry
 
 frisks did not occur at common law and would have been viewed unfavorably by the Constitution's framers."); George C. Thomas III,
 
 Time Travel, Hovercrafts, and the Framers: James Madison Sees the Future and Rewrites the Fourth Amendment
 
 ,
 
 80 Notre Dame L. Rev. 1451
 
 , 1515 (2005) (concluding that
 
 Terry
 
 , insofar as it permits a warrantless frisk on the street without probable cause, "would have baffled the Framers").
 
 [1]
 

 Relying on Justice Scalia's originalist position, Mr. Johnson argues that we should construe
 
 Terry
 
 narrowly, and not extend it to allow the seizure and removal of items that are neither weapons nor contraband.
 
 See
 
 Mr. Johnson's En Banc Br. at 18-23. But the majority barely acknowledges this argument, and declines to address its merits. According to the majority, we are bound by
 
 Terry
 
 , and must therefore ignore the original understanding of the Fourth Amendment.
 
 [2]
 

 The majority is correct that
 
 Terry
 
 constitutes binding precedent, and that no one on this court can wish it away. But accepting
 
 Terry
 
 does not require extending its reach on an issue of first impression.
 
 Terry
 
 permitted pat-downs for weapons, and only weapons.
 
 See
 

 Ybarra v. Illinois
 
 ,
 
 444 U.S. 85
 
 , 93-94,
 
 100 S.Ct. 338
 
 ,
 
 62 L.Ed.2d 238
 
 (1979) ("Nothing in
 
 Terry
 
 can be understood to allow ... any search whatever for anything but weapons."). By allowing officers to seize a stand-alone bullet from an unarmed suspect who is in handcuffs and being held at gunpoint by several officers, the majority expands
 
 Terry
 
 beyond its "narrow scope."
 
 Dunaway v. New York
 
 ,
 
 442 U.S. 200
 
 , 210,
 
 99 S.Ct. 2248
 
 ,
 
 60 L.Ed.2d 824
 
 (1979).
 
 [3]
 

 There are ways to deal with a precedent whose pedigree is questionable. If
 
 Terry
 
 rests on a shaky originalist foundation, something the majority does not dispute, there is always the option of declining to broaden it-of "refus[ing] to extend it one inch beyond its previous contours." Richard Epstein,
 
 The Classical Liberal Alternative to Progressive and Conservative Constitutionalism
 
 ,
 
 77 U. Chi. L. Rev. 887
 
 , 903 (2010) (proposing a "proper" originalist response to the Supreme Court's New Deal jurisprudence).
 
 See also
 
 Bork, The
 Tempting of America 158-59 (arguing that even where questionable precedential decisions "cannot be overruled ... they can be confined to the subject areas they concern.");
 
 Troxel v. Granville
 
 ,
 
 530 U.S. 57
 
 , 92,
 
 120 S.Ct. 2054
 
 ,
 
 147 L.Ed.2d 49
 
 (2000) (Scalia, J., dissenting) ("While I would not now overrule those [erroneous] earlier cases ... neither would I extend the theory upon which they rested to this new context."). Why not then stop where
 
 Terry
 
 and its progeny stop, and prohibit, absent probable cause, the seizure of items which are neither weapons nor contraband?
 

 * * * * * * *
 

 The majority's decision to sidestep Mr. Johnson's originalist argument is particularly perplexing given the Supreme Court's instruction that "[i]n determining whether a search or seizure is unreasonable, we
 
 begin
 
 with history," and "look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."
 
 Virginia v. Moore
 
 ,
 
 553 U.S. 164
 
 , 168,
 
 128 S.Ct. 1598
 
 ,
 
 170 L.Ed.2d 559
 
 (2008) (emphasis added). The majority appears to believe that
 
 Terry
 
 is an exception to this interpretive approach, and focuses instead on a pragmatic balancing of individual privacy and officer safety.
 
 See
 
 Maj. Op. at 1002 (asserting that in the
 
 Terry
 
 context we "consider the need to protect officer safety" without regard to original meaning).
 
 [4]
 

 But this suggestion-that we consider history in some Fourth Amendment cases, and not in others-is precisely the type of "halfway originalism" that the majority purports to reject.
 
 See
 
 Maj. Op. at 1002 (quoting
 
 Janus v. AFSCME
 
 , --- U.S. ----,
 
 138 S.Ct. 2448
 
 , 2470,
 
 201 L.Ed.2d 924
 
 (2018) ). And this approach is difficult to square with our consideration of history in analyzing the scope of various constitutional provisions (including the Fourth Amendment itself).
 
 See, e.g.,
 

 United States v. Gecas
 
 ,
 
 120 F.3d 1419
 
 , 1435-57 (11th Cir. 1997) (en banc) (Fifth Amendment privilege against self-incrimination);
 
 Evans v. Stephens
 
 ,
 
 387 F.3d 1220
 
 , 1222-27 (11th Cir. 2004) (en banc) (President's power to "fill ... Vacancies" under Art. II, § 2, cl. 3 of the Constitution );
 
 United States v. Bellaizac-Hurtado
 
 ,
 
 700 F.3d 1245
 
 , 1249-51, 1254 (11th Cir. 2012) (Congress' authority to define "Offences against the Law of Nations" under Art. I, § 8, cl. 10 of the Constitution );
 
 United States v. Touset
 
 ,
 
 890 F.3d 1227
 
 , 1232 (11th Cir. 2018) (Fourth Amendment).
 

 Defending its ahistorical approach, the majority warns Mr. Johnson that he might not "like the result" if history were front and center.
 
 See
 
 Maj. Op. at 1002. It says that, under the original understanding of the Fourth Amendment, Mr. Johnson's motion to suppress would be doomed because courts would not be required to exclude unlawfully obtained evidence. But this rhetorical challenge, though nicely put, is an empty one. We are bound by directly controlling Supreme Court precedent to recognize and apply the exclusionary rule-whatever its originalist pedigree-in the context of
 
 Terry
 
 pat-downs.
 
 See, e.g.,
 

 Terry
 
 , 392 U.S. at 12,
 
 88 S.Ct. 1868
 
 ;
 
 Dickerson
 
 ,
 
 508 U.S. at 372
 
 ,
 
 113 S.Ct. 2130
 
 . No similar precedent compels the
 expansion of
 
 Terry
 
 to permit the seizure of items that are neither weapons nor contraband under the circumstances present here.
 

 The majority wants to make it seem that its holding results a priori from
 
 Terry
 
 and its progeny. That is not so. Under similar circumstances other federal courts have concluded that the seizure of ammunition from a suspect's clothing exceeded the scope of a
 
 Terry
 
 pat-down
 
 . See
 

 United States v. Miles
 
 ,
 
 247 F.3d 1009
 
 , 1015 (9th Cir. 2001) ;
 
 United States v. Lemons
 
 ,
 
 153 F.Supp.2d 948
 
 , 962 (E.D. Wisc. 2001). The majority may not like these cases, but they are no less relevant than the authorities cited in its opinion.
 

 * * * * * * *
 

 Originalism, we are told, is a preferable mode of constitutional interpretation because it provides "an objective basis for judgment that does not merely reflect the judge's own ideological stance." Michael W. McConnell,
 
 Active Liberty: A Progressive Alternative to Textualism and Originalism?
 
 ,
 
 119 Harv. L. Rev. 2387
 
 , 2415 (2006).
 
 See also
 
 Antonin Scalia,
 
 Originalism: The Lesser Evil
 
 ,
 
 57 U. Cin. L. Rev. 849
 
 , 863-64 (1989) ("[Originalism] establishes a historical criterion that is conceptually quite separate from the preferences of the judge himself."); Lillian R. BeVier,
 
 The Integrity and Impersonality of Originalism
 
 ,
 
 18 Harv. J.L. & Pub. Pol'y 283
 
 , 291 (1996) ("The criteria of originalism constrain all the participants in the game-including, most especially, the referees."). By choosing to avoid Mr. Johnson's originalist argument against the extension of
 
 Terry
 
 and its progeny, the majority gives credence to those who have noted that originalism, when applied selectively, can be just as subjective (and just as subject to manipulation) as other competing theories of constitutional interpretation:
 

 [H]ot-and-cold originalism grants the [judge] the discretion to decide when pragmatic considerations, whatever they may be, allow a departure from originalist orthodoxy. And ... this discretion dilutes originalism's constraining power.
 

 J. Harvie Wilkinson, III, Cosmic Constitutional Theory 56 (2012).
 
 See also
 
 Frank Cross, The Failed Promise of Originalism 188 (2013) ("[I]n realistic practice, all of the justices pick and choose when to use originalism, and none are faithful acolytes to the method.").
 

 Some may view the majority's holding as properly balancing the interest that individuals have in privacy against the interest that officers have in safety. But the majority's balancing is of a 21st-century variety, without so much as a nod to history. Time will tell whether originalism, in one of its various forms, will continue to make ad hoc appearances in the opinions of this court.
 

 The only other item besides weapons that the Fourth Amendment permits a police officer to seize during a
 
 Terry
 
 stop and frisk is "contraband" detected by plain feel, if the officer is acting within the bounds of
 
 Terry
 
 at the moment the officer develops probable cause to believe contraband is present.
 
 Minnesota v. Dickerson
 
 ,
 
 508 U.S. 366
 
 , 374-76,
 
 113 S.Ct. 2130
 
 ,
 
 124 L.Ed.2d 334
 
 (1993). Neither the government nor the majority believes that the freestanding bullet was contraband in this case, and I agree.
 

 Mr. Johnson previously had been convicted of a felony, so he could not lawfully possess a gun or ammunition. But his prior felony conviction did not justify seizure of a single bullet found in Mr. Johnson's pocket as contraband because at the time the officers seized the bullet, the officers had no information that Mr. Johnson was a convicted felon. They therefore had no probable cause to believe that a single bullet would be contraband in Mr. Johnson's possession.
 
 See
 

 id.
 

 at 375-76
 
 ,
 
 113 S.Ct. 2130
 
 ;
 
 United States v. Blom
 
 ,
 
 242 F.3d 799
 
 , 808 (8th Cir. 2001) ("reject[ing] [any] suggestion that a police officer with no knowledge of a citizen's criminal history may constitutionally seize firearms or ammunition without a warrant, so long as the citizen turns out to be, in hindsight, a convicted felon").
 

 The majority is not alone in refusing to address the merits of Mr. Johnson's originalist argument. The government has chosen to proceed as if the argument were never made.
 
 See
 
 Govt.'s En Banc Br. at 21-50. So have the concurring opinions.
 

 None of our sister circuits has expanded
 
 Terry
 
 this far. The majority cites
 
 United States v. Ward
 
 ,
 
 23 F.3d 1303
 
 (8th Cir. 1994), for the proposition that "an officer may seize ammunition when it threatens the safety of officers." Maj. Op. at 999. But in
 
 Ward
 
 , unlike here, the pat-down uncovered a sawed-off shotgun in addition to ammunition.
 
 See
 

 Ward
 
 ,
 
 23 F.3d at 1304
 
 . The majority also cites cases from state courts for the same proposition, but in all of those cases there were facts showing or suggesting that the suspect was armed or had a firearm nearby.
 
 See, e.g.,
 

 Scott v. State
 
 ,
 
 110 Nev. 622
 
 ,
 
 877 P.2d 503
 
 , 504-05 (1994) (police seized 12-gauge shotgun shells from defendant who had been sitting in the rear seat of a vehicle which "contained firearms, including a loaded 12-gauge shotgun on the floor of the rear seat"). There are no such facts here.
 

 The majority's framework leads to a question. If officer safety is the
 
 raison d'être
 
 of
 
 Terry
 
 , on what rationale does the majority uphold the seizure of the nylon holster from Mr. Johnson's pocket? We are not told.
 
 Cf.
 

 United States v. Hirsch
 
 ,
 
 493 F.2d 465
 
 , 466 (5th Cir. 1974) (suppressing firearm, holster
 
 and
 
 bullets seized during a 2:00 a.m.
 
 Terry
 
 frisk of a driver because, despite his "standing around nervously and giving confused explanations for his presence in the neighborhood," the officers were not in fear for their safety and had no basis to believe the driver was armed or dangerous).