**UNITED STATES of America, Appellee,**

v.

**Wang Kun LUE, Defendant,**

**Chen De Yian, Defendant–Appellant.**

**No. 622, Docket 96–1314.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 5, 1996.

Decided Jan. 14, 1998.

80

Tai H. Park, Assistant United States Attorney (Mary Jo White, United States Attorney, Southern District of New York, New York City, Marian W. Payson, Assistant United States Attorney, on the briefs), for Appellee.

Andrew H. Shapiro (Henriette D. Hoffman, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York City), for Defendant–Appellant.

Before: WINTER, Chief Judge, and NEWMAN and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Defendant, Chen De Yian, appeals from a judgment of conviction entered by the United States District Court for the Southern District of New York (Denise L. Cote, *Judge*), following a conditional plea of guilty arising from defendant's attempt to abduct and hold a person hostage until the hostage's relatives paid a sum of money to secure the victim's release. The defendant pled guilty to (1) violating 18 U.S.C. § 1203, the Act for the Prevention and Punishment of the Crime of Hostage–Taking ("Hostage Taking Act"), Pub.L. No. 98–473, Title II, § 2002(a), 98 Stat. 2186 (1984), and (2) carrying a firearm in relation to the hostage taking in violation of 18 U.S.C. § 924(c). The district court sentenced the defendant to imprisonment for 147 months followed by supervised release for five years and a special assessment of $100. Pursuant to the plea agreement, defendant seeks review of the district court's denial of his motion to dismiss the hostage taking charge. *See United States v. Chen De Yian,* 905 F.Supp. 160, 161–62 (S.D.N.Y. 1995). The defendant renews his arguments before the district court that the Hostage

Taking Act (1) exceeds Congress's Article I authority, (2) violates the principles of federalism embodied in the Tenth Amendment, and (3) effects a denial of Equal Protection as guaranteed by the Fifth Amendment. We affirm.

## I. BACKGROUND

The counts to which defendant pled guilty arose from his unsuccessful efforts to abduct Chan Fung Chung in order to force the victim's family to pay ransom to obtain his release. The indictment alleges that in or about May 1991 Chen and his co-conspirators met in New York City to discuss and plan the seizure of Chan Fung Chung. On April 24, 1992, Chen and his co-conspirators attempted to force Chan Fung Chung into an automobile on East 13th Street in Manhattan. The defendants' attempt to abduct the victim was thwarted by a firefighter and an off-duty police officer who heard the victim's cries. Although his co-conspirators escaped, Chen was arrested by New York City police officers with a .30 caliber handgun in his possession. Following the arrest, Chen pled guilty in state court to weapons-use charges and served 18 months in state prison. Subsequently, Chen was indicted on federal charges relating to the attempted abduction as well as two homicides in Virginia which were part of an alleged murder-for-hire scheme.

After the district court denied the defendant's motion to dismiss the hostage taking counts on constitutional grounds, the defendant entered into a plea agreement with the government. On November 22, 1995, Chen entered a plea of guilty to two counts of the multi-count indictment, including the only count at issue in this appeal: the violation of the Hostage Taking Act, 18 U.S.C. § 1203. Under the plea agreement, Chen preserved his right to appellate review of the district court's decision that 18 U.S.C. § 1203 was constitutional.

## II. DISCUSSION

### A. *The Hostage Taking Act*

On April 26, 1984, President Reagan proposed legislation to Congress to combat international terrorism. *See* Message from the President of the United States Transmitting Four Drafts of Proposed Legislation to Attack the Pressing and Urgent Problem of International Terrorism, H.R. Doc. No. 98–211, 98th Cong., 2d Sess. (1984) ("Presidential Message"). This proposal included a predecessor version of the Hostage Taking Act. *Id.* at 5–9. The legislation was designed to implement the International Convention Against the Taking of Hostages, Dec. 18, 1979, T.I.A.S. No. 11,081 ("Hostage Taking Convention" or "Convention"), ratified by the Executive in 1981, *see Presidential Message* at 2. The Convention binds the signatories to take specific steps to adopt "effective measures for the prevention, prosecution and punishment of all acts of taking of hostages as manifestations of international terrorism." *Hostage Taking Convention,* preamble, T.I.A.S. No. 11,081. In particular, the signatories agreed that

> [a]ny person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages . . . within the meaning of this Convention.

*Id.* art. 1. The signatories also agreed to make hostage taking punishable in accordance with the deep gravity of the offense. *See id.* art. 2. Presumably to accommodate jurisdictional concerns, the terms of the Convention are inapplicable if a covered offense was committed within a single nation, the hostage and the alleged offender are nationals of that nation, and the alleged offender is found within the territory of that nation. *Id.* art. 13.

Pursuant to its obligation under the Convention, in late 1984, Congress passed, and the President signed, the Hostage Taking Act, which provides in pertinent part:

> (a) Except as provided in subsection (b) of this section, whoever, whether inside or outside the United States, seizes or detains

and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

. . . .

(b)(2) It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

18 U.S.C. § 1203. This statute is the focus of defendant's constitutional challenge.

### B. *Necessary and Proper Clause*

Defendant first argues that the district court erred in holding that Congress has the authority to pass the Hostage Taking Act under the Necessary and Proper Clause of Article I,[1] as an adjunct to the Executive's acknowledged authority under Article II to enter into treaties, with the advice and consent of the Senate.[2] Chen contends that (1) the Hostage Taking Act is unconstitutional because the Hostage Taking Convention upon which it is based exceeds the Executive's authority under the Treaty Clause and (2) even if entry into the Convention is in accord with the treaty-making authority, the Hostage Taking Act is not a "plainly adapted" means of effectuating the Convention's ends and thus exceeds Congress's authority under the Necessary and Proper clause.

■ At the outset we note that Congress's authority under the Necessary and Proper

Clause extends beyond those powers specifically enumerated in Article I, section 8. As the clause specifically states, "Congress shall have Power ... [t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. Accordingly, Congress may enact laws necessary to effectuate the treaty power, enumerated in Article II of the Constitution. *See Missouri v. Holland,* 252 U.S. 416, 432, 40 S.Ct. 382, 383, 64 L.Ed. 641 (1920); *Neely v. Henkel,* 180 U.S. 109, 121, 21 S.Ct. 302, 306, 45 L.Ed. 448 (1901); *see also* Louis Henkin, *Foreign Affairs and the United States Constitution* 204 & n.111 (2d ed. 1996)("The 'necessary and proper' clause originally contained expressly the power 'to enforce treaties' but it was stricken as superfluous.") (citing 2 M. Farrand, *The Records of the Convention of 1787,* at 382 (rev. ed.1966)).

### 1. The Treaty Power

■ We need not pause long over defendant's contention that entry into the Hostage Taking Convention was beyond the Executive's authority under Article II to sign (and Congress to assent to) treaties. As defendant himself acknowledges, "[t]o hold that the Treaty Power has been exceeded ... would of course be a drastic step." Brief of Defendant–Appellant at 14. His argument rests on the fundamental, but somewhat ambiguous, proposition in *Asakura v. City of Seattle* that the Executive's treaty power "extend[s] to all proper subjects of negotiation between our government and other nations." 265 U.S. 332, 341, 44 S.Ct. 515, 516, 68 L.Ed. 1041 (1924) (citing *Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920); *In re Ross,* 140 U.S. 453, 463, 11 S.Ct. 897, 899, 35 L.Ed. 581 (1891); *Geofroy v. Riggs,* 133 U.S. 258, 266, 267, 10 S.Ct. 295,

---

**1.** "The Congress shall have Power ... [t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18.

**2.** "[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur...." *Id.* art. II, § 2, cl. 2.

296, 297, 33 L.Ed. 642 (1890)). But, defendant argues that the Hostage Taking Convention regulates matters of purely domestic concern not touching on relations with other nations. Accordingly, he concludes that entry into the Convention was beyond the constitutional authority of the executive. Defendant is in error on two counts: (1) his overly restrictive view of the federal treaty power and (2) his evaluation of the Convention as addressing purely domestic interests.

As for the scope of the treaty power, defendant fails to acknowledge the breadth of the *Asakura* Court's statement of the extent of that power. In *Asakura*, the Court held that the executive's treaty power "extend[s] to all *proper subjects* of negotiation between our government and other nations." *Asakura*, 265 U.S. at 341, 44 S.Ct. at 516 (citing *Geofroy*, 133 U.S. at 266, 10 S.Ct. at 296) (emphasis added). Invoking this standard simply begs the question: What is a "proper subject" of negotiation between governments? Admittedly, there must be certain outer limits, as yet undefined, beyond which the executive's treaty power is constitutionally invalid. *See, e.g.,* Laurence H. Tribe, *Taking Text and Structure Seriously: Reflections on Free–Form Method in Constitutional Interpretation*, 108 Harv. L.Rev. 1221, 1261 n.133 (1995) (noting that the Treaty Power is subject to certain structural limitations and offering as an example of such limitations: "The President and the Senate could not ... create a fully operating national health care system in the United States by treaty with Canada...."); Louis Henkin, *Foreign Affairs and the United States Constitution* 184–85, 196–98 (2d ed.1996). But within such generous limits, it is not the province of the judiciary to impinge upon the Executive's prerogative in matters pertaining to foreign affairs.

The defendant relies far too heavily on a dichotomy between matters of purely domestic concern and those of international concern, a dichotomy appropriately criticized by commentators in the field.

> Contrary to what was once suggested, the Constitution does not require that an international agreement deal only with "matters of international concern." The

references in the Constitution presumably incorporate the concept of treaty and of other agreements in international law. International law knows no limitations on the purpose or subject matter of international agreements, other than that they may not conflict with a peremptory norm of international law. States may enter into an agreement on any matter of concern to them, and international law does not look behind their motives or purposes in doing so. Thus, the United States may make an agreement on any subject suggested by its national interests in relations with other nations.

*Restatement (Third) of the Foreign Relations Law of the United States* § 302, cmt. c (1986) (citation omitted). The circumstances of *Asakura* exemplify the breadth of the treaty power. The treaty in that case embodied a reciprocal-privileges agreement whereby the then-subjects of Japan would enjoy certain enumerated privileges in the United States which the citizens of the United States would also enjoy in Japan. The privileges entailed such "purely domestic" matters as the ability to "carry on trade, wholesale and retail, to own or lease and occupy houses, manufactories, warehouses and shops" as well as other matters. *Id.* at 340, 44 S.Ct. at 516. *See also Holland,* 252 U.S. at 431–32, 40 S.Ct. at 382–83 (treaty regulating the killing, capture, or selling of migratory birds); *Geofroy,* 133 U.S. at 266, 10 S.Ct. at 296 (treaty addressing rights of inheritance).

Whatever the potential outer limit on the treaty power of the Executive, the Hostage Taking Convention does not transgress it. At the most general level, the Convention addresses—at least in part—the treatment of foreign nationals while they are on local soil, a matter of central concern among nations. More specifically, the Convention addresses a matter of grave concern to the international community: hostage taking as a vehicle for terrorism. In fact, the preamble of the Convention explicitly so states:

> the taking of hostages is an offence of grave concern to the international community and ... in accordance with the provisions of this Convention, any person

committing an act of hostage taking shall either be prosecuted or extradited ... [. I]t is urgently necessary to develop international cooperation between States in devising and adopting effective measures for the prevention, prosecution and punishment of all acts of taking of hostages as manifestations of international terrorism. *Hostage Taking Convention,* preamble, T.I.A.S. No. 11,081. In short, the Hostage Taking Convention is well within the boundaries of the Constitution's treaty power.

### 2. The Hostage Taking Act

■ The defendant next challenges the means by which Congress effectuated the terms of the Convention: the enactment of the Hostage Taking Act. Defendant contends that the Act sweeps too broadly and, thus, exceeds Congress's authority to pass laws "necessary and proper" to the effectuation of the Convention. U.S. Const. Art. 1, § 8, cl. 18. More precisely, defendant argues that because the Hostage Taking Convention targets a specific aspect of international terrorism—hostage taking—the statute effectuating the Convention must deal narrowly with international terrorism or risk invalidity under the Necessary and Proper Clause. However, defendant's view of the ·congressional authority under the Necessary and Proper Clause is too cramped.

If the Hostage Taking Convention is a valid exercise of the Executive's treaty power, there is little room to dispute that the legislation passed to effectuate the treaty is valid under the Necessary and Proper Clause. *See Holland,* 252 U.S. at 432, 40 S.Ct. at 383 (noting that, under normal circumstances, "[i]f the treaty is valid there can be no dispute about the validity of [a] statute [passed] under Article I, Section 8, as a necessary and proper means to execute the powers of the Government").

■ Defendant makes much of language in *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), noting that for a statute to pass muster under the Necessary and Proper Clause it must be "plainly adapted" to satisfying a constitutionally permissible end. *Id.* at 421 ("Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."). In effect, however, the "plainly adapted" standard requires that the effectuating legislation bear a rational relationship to a permissible constitutional end. Were this not the case, any congressional enactment not passed pursuant to an expressly enumerated power would be subject to challenge on some more rigorous means-ends analysis. Such thoroughgoing judicial involvement in the day-to-day enactments of Congress would undercut the foundation on which *M'Culloch* rests: the need to preserve a realm of flexibility in which Congress can carry out its delegated responsibilities. *See id.* (reasoning that the "constitution must allow to the national legislature ... discretion[ ] with respect to the means by which the powers it confers are to be carried into execution"). The Act here plainly bears a rational relationship to the Convention; indeed, it tracks the language of the Convention in all material respects. *Compare* 18 U.S.C. § 1203(a) *with Hostage Taking Convention,* art. I, T.I.A.S. No. 11,081.

### C. *Federalism Challenge*

■ The defendant contends that, even if the Hostage Taking Act passes muster under the Necessary and Proper Clause as an adjunct to the Executive's authority under the Treaty Clause, the Act nonetheless must be struck down because it impermissibly invades the authority of the states in violation of the Tenth Amendment. Specifically, defendant contends that because the Hostage Taking Act potentially criminalizes "[d]omestic, non-political abductions," Brief of Defendant–Appellant at 22, and because such abductions "are not in any meaningful way a uniquely international (or national) problem," *id.,* the Act violates the principles of federalism embodied in the Tenth Amendment. We reject this argument.

The Tenth Amendment provides, in full: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const.

amend. X. The Constitution expressly vests the power to enter into treaties in the Executive, U.S. Const. art II, § 2, cl. 2; accordingly, the power wielded by the Executive (with the advice and consent of the Senate) is "delegated" to the federal government and not "reserved" to the states. As one distinguished commentator has noted:

Since the Treaty Power was delegated to the federal government, whatever is within its scope is not reserved to the states: the Tenth Amendment is not material. Many matters, then, may appear to be "reserved to the States" as regards domestic legislation if Congress does not have power to regulate them; but they are not reserved to the states so as to exclude their regulation by international agreement.

Louis Henkin, *Foreign Affairs and the United States Constitution* 191 (2d ed.1996). *See also id.* at 191 n.** (many matters under the Tenth Amendment "are, one might say, left to the states subject to 'defeasance' if the United States should decide to make a treaty about them"). Thus, the treaty power is not subject to meaningful limitation under the terms of the Tenth Amendment.

*Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920), on which defendant relies heavily, is not to the contrary. In *Holland,* the State of Missouri argued that the Migratory Bird Treaty Act of 1918, regulating the killing, capturing, or selling of certain migratory birds, pursuant to a treaty entered into between the United States and Great Britain (on behalf of Canada), was an unconstitutional interference with the rights reserved to the states by the Tenth Amendment. *See id.* at 430–32, 40 S.Ct. at 382–83. In that case, prior to the United States' entry into the treaty with Great Britain (and, thus, prior to the passage of the Migratory Bird Treaty Act), Congress—acting on its own—had attempted in an earlier act to regulate similar conduct and two federal courts had ruled that the act was beyond Congress's authority under the Tenth Amendment. *See id.* at 432, 40 S.Ct. at 383. On this basis, Missouri argued, as summarized by Justice Holmes in his opinion for the Court, "what an act of Congress could not do unaided, in derogation of the powers reserved to the

States, a treaty cannot do." *Id.* The Court rejected this argument:

It is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could, and it is not lightly to be assumed that, in matters requiring national action, "a power which must belong to and somewhere reside in every civilized government" is not to be found.

*Id.* at 433, 40 S.Ct. at 383 (quoting *Andrews v. Andrews,* 188 U.S. 14, 33, 23 S.Ct. 237, 240, 47 L.Ed. 366 (1903)). The Court, finding an important national interest at stake, held that no "invisible radiation from the general terms of the Tenth Amendment" would require invalidation of the Act. *Id.* at 434, 40 S.Ct. at 384. The same is true in this case.

Defendant's primary Tenth Amendment challenge to the Hostage Taking Act rests on his contention that hostage taking is a local concern and that, under *Holland,* a legislative enactment effectuating a treaty will not pass muster under the Tenth Amendment unless such an enactment addresses a uniquely national or international matter. Such a reading finds some support in the language of the Court's opinion. *See, e.g., id.* at 434, 40 S.Ct. at 384. However, we need not decide the question, because in this case there is a sufficient national (indeed, international) interest supporting Congress's passage of the Hostage Taking Act.

### D. *Equal Protection Challenge*

█ Finally, defendant contends that the Hostage Taking Act violates the equal protection principles embodied in the Fifth Amendment's Due Process Clause. *See Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). In particular, the defendant contends that the Act runs afoul of these principles because it criminalizes conduct undertaken by foreign nationals which would not be criminal if undertaken by United States' nationals and because such a classification is not supported by a substantial governmental interest.

There is little doubt, despite government protestations to the contrary, that the Hostage Taking Act discriminates against offend-

ers on the basis of alienage. If the hostage-taking victim is a national, the Act criminalizes conduct by an alien that would not be sanctionable if undertaken by a United States citizen (except where the purpose of the crime is to compel the United States to act or refrain from acting). *See United States v. Lopez–Flores*, 63 F.3d 1468, 1471–72 (9th Cir.1995), ("If either the alleged offender or the victim is a non-national, the Hostage Taking Act applies; however, if both the alleged offender and the victim(s) are nationals of the United States (and the offense occurred in the United States and each alleged offender is found in the United States) then the Act is inapplicable, unless the alleged offender sought to compel the government of the United States to do or abstain from any act.") *cert. denied*, 516 U.S. 1082, 116 S.Ct. 794, 133 L.Ed.2d 743 (1996).

The principle area in dispute in defendant's equal protection challenge is, then, the appropriate level of judicial scrutiny to which the Act must be subjected. Defendant argues that the Hostage Taking Act is subject to heightened judicial scrutiny because it discriminates on the basis of alienage, an inherently suspect classification. Although defendant is correct that alienage has been treated as a suspect classification requiring heightened scrutiny, *see, e.g., Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971), he fails to properly acknowledge the context in which the Court has so ruled. The Court has recognized alienage as a suspect classification only when a state or local government has sought to employ the classification to disadvantage foreign nationals. *See, e.g., Bernal v. Fainter*, 467 U.S. 216, 219, 104 S.Ct. 2312, 2315, 81 L.Ed.2d 175 (1984) (generally, "a state law that discriminates on the basis of alienage can be sustained only if it can withstand strict judicial scrutiny"); *Graham*, 403 U.S. at 372, 91 S.Ct. at 1852; *Hernandez v. Texas*, 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954).

The situation is different when it is the federal government that is drawing the distinction between citizens of the United States and those of foreign countries. Generally, the federal government is not held to the same searching scrutiny when it draws lines on the basis of alienage. The Court has recognized that the federal government has national interests when dealing with aliens that are different from those of the individual states. *See, e.g., Mathews v. Diaz*, 426 U.S. 67, 79–81, 96 S.Ct. 1883, 1891–92, 48 L.Ed.2d 478 (1976); *see also Restatement (Third) Foreign Relation Law of the United States* § 722, cmt. d (1986).

■ Judicial deference to the federal government in this context is tied to Congress's express Constitutional authority to regulate the conduct of noncitizens within our borders. *See Mathews*, 426 U.S. at 81, 96 S.Ct. at 1892.

'(A)ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'

*Id.* at 81 n. 17, 96 S.Ct. at 1892 n. 17 (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952)); *see also Lopez–Flores*, 63 F.3d at 1473–74. In addition to such constitutionally rooted authority, the political branches of the government are also vested with sweeping authority to regulate immigration, *see, e.g., Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977), and foreign affairs generally, *Toll v. Moreno*, 458 U.S. 1, 10, 102 S.Ct. 2977, 2982, 73 L.Ed.2d 563 (1982). In light of the federal government's primary authority in these areas, and because "it is the business of the political branches of the Federal Government, rather than that of either the States or the Federal Judiciary, to regulate the conditions of entry and residence of aliens," *Mathews*, 426 U.S. at 84, 96 S.Ct. at 1893, state or local laws that disadvantage aliens are presumptively invalid while federal laws doing the same are accorded substantial deference.

■ This is not to say that foreign nationals on our soil are without any protection from federal governmental action under the equal protection component of the Fifth

Amendment. They do enjoy such protection; however, it is constrained in light of the responsibility of the political branches to regulate the relationship between the United States and noncitizens. *See, e.g., United States v. Duggan,* 743 F.2d 59, 76 (2d Cir. 1984); *see also Plyler v. Doe,* 457 U.S. 202, 219 n. 19, 102 S.Ct. 2382, 2396 n. 19, 72 L.Ed.2d 786 (1982). "The fact that all persons, aliens and citizens alike, are protected by the [Fifth Amendment's] Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship...." *Mathews,* 426 U.S. at 78, 96 S.Ct. at 1890. Rather, as the Court in *Mathews* acknowledged, an array of constitutional and statutory provisions rests on the assumption that there are legitimate distinctions between citizens and aliens that "may justify attributes and benefits for one class not accorded the other." *Id.* In short, "[t]he fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious.'" *Id.* at 80, 96 S.Ct. at 1891.

As long as the Hostage Taking Act is rationally related to a legitimate government interest it satisfies principles of equal protection in this context. *See Lopez–Flores,* 63 F.3d at 1473–74; *see also Mathews,* 426 U.S. at 83, 96 S.Ct. at 1893 (applying relaxed judicial scrutiny to congressional restriction of alien's eligibility for Medicaid benefits); *Nyquist v. Mauclet,* 432 U.S. 1, 7 n. 8, 97 S.Ct. 2120, 2124 n. 8, 53 L.Ed.2d 63 (1977); *Restatement (Third) Foreign Relation Law of the United States* § 722, cmt. d (1986); *cf. City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)(stating rational-relation test is general rule in equal protection challenges). In our view, the Act clears this constitutional hurdle.

The classification drawn by the Hostage Taking Act covers all aliens involved in hostage-taking incidents. The asserted purpose of the statute, along with the antecedent Convention, is to address a matter of grave concern to the international community: hostage taking as a manifestation of international terrorism. *See Hostage Taking Convention,* preamble, T.I.A.S. No. 11,081. We recognize that in the Hostage Taking Act Congress employs the classification of alienage to proscribe conduct which may not always bear a direct relationship to the Act's principal object of stemming acts of terrorism, and that at some point a classification of this sort may have a "relationship to [the] asserted goal [which] is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne,* 473 U.S. at 446, 105 S.Ct. at 3258; *see also United States v. Song,* No. 95 Cr. 129, 1995 WL 736872, at *5 (S.D.N.Y. Dec. 13, 1995). However, in this instance, Congress rationally concluded that a hostage taking within our jurisdiction involving a noncitizen is sufficiently likely to involve matters implicating foreign policy or immigration concerns as to warrant a federal criminal proscription. The connection between the act and its purpose is not so attenuated as to fail to meet the rational-basis standard. *See Lopez–Flores,* 63 F.3d at 1475; *Song,* 1995 WL 736872 at *5; *United States v. Pacheco,* 902 F.Supp. 469, 472 (S.D.N.Y.1995).

### III.  CONCLUSION

We have considered the defendant's remaining arguments and find them to be without merit. For the foregoing reasons, we affirm the judgment of the district court.