[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10529

_____

D.C. Docket No. 1:15-cr-20686-JAL-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARCUS NOEL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 26, 2018)

Before MARCUS, ANDERSON, and HULL, Circuit Judges.

ANDERSON, Circuit Judge:

Marcus Noel appeals his judgment of conviction on counts 1 and 2 of the indictment.  In Count 1, he was charged with conspiracy to seize or detain, and threaten to kill, injure, or continue to detain, a national of the United States in order to compel a third person to pay ransom (i.e., hostage taking), in violation of 18 U.S.C. § 1203.  In Count 2, he was charged with the substantive offense of hostage taking in violation of § 1203.

Noel admitted that in Port au Prince, Haiti, he and a co-conspirator "knowingly and willfully conspired, agreed, and planned to take hostage . . . an adult female who is a citizen of the United States, and detain [her] against her will for the purposes of demanding a ransom payment."  Specifically, Noel and his co-conspirator approached the victim and took her hostage by brandishing a firearm.  Noel and his co-conspirator took from her two cellular telephones, her wedding rings, her Haitian driver's license and some Haitian and United States currency.  They called the victim's family members, also located in Haiti, and demanded a ransom of $150,000 for her safe release.  Later that evening they drove her to a school where they blindfolded, handcuffed, and gagged her, keeping her at the school for three days.  In phone calls to the victim's family, Noel and his co-conspirator continued to demand $150,000 for her release, and Noel threatened to kill the victim and her children if her family did not pay the ransom.  Haitian officials tracked Noel to the school using telephone records and found the victim's

2

driver's license in his pocket.  The district court sentenced Noel to 235 months' imprisonment.

Noel raises three arguments on appeal.  First, he argues that the prosecution was required to prove that he knew his victim was an American citizen and that the record does not indicate that he had such knowledge.  Second, Noel argues that Congress did not intend § 1203 to apply to a street crime like his when committed by a foreign national in a foreign country and that Congress intended the statute to apply only to acts of terrorism.  Finally, Noel raises constitutional challenges: an argument that Congress did not have the power to enact § 1203, and an argument that even if it did, the district court's exercise of extraterritorial jurisdiction over him, a Haitian citizen, to prosecute a crime committed entirely in Haiti violates due process. We address his arguments in turn.

## I.    STANDARD OF REVIEW

Our review of all three issues is de novo.  United States v. Santiago, 601 F.3d 1241, 1243 (11th Cir. 2010); United States v. Gray, 260 F.3d 1267, 1271 (11th Cir. 2001).  Although a "silent statute is presumed to apply only domestically," United States v. Lopez-Vanegas, 493 F.3d 1305, 1311 (11th Cir. 2007), a statute may apply extraterritorially if it demonstrates on its face that extraterritorial application is Congress's express intent, United States v. Banjoko, 590 F.3d 1278, 1281 (11th Cir. 2009).  See also United States v. Bowman, 260

3

U.S. 94, 98, 43 S.Ct. 39, 41 (1922) ("If punishment . . . is . . . extended to include those [acts] committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negat[e] the purpose of Congress in this regard.").  "When construing the language of a statute, we 'begin [ ] where all such inquiries must begin: with the language of the statute itself,' and we give effect to the plain terms of the statute." In re Valone, 784 F.3d 1398, 1402 (11th Cir. 2015) (alteration in original) (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 1030 (1989)).  Further, "if the statute's language is clear, there is no need to go beyond the statute's plain language into legislative history." Shockley v. Comm'r of IRS, 686 F.3d 1228, 1235 (11th Cir. 2012).

## II.   DISCUSSION

A. Was the Prosecution Required to Prove that Noel Knew His Victim was an American Citizen?

Noel was not required to know that his victim was American because the requirement of § 1203 that the victim be an American is purely jurisdictional. When a statute is silent as to mens rea, we usually interpret it to require proof of general intent.  United States v. Ettinger, 344 F.3d 1149, 1158 (11th Cir. 2003). However, no mens rea is necessary for elements that are purely jurisdictional. United States v. Campa, 529 F.3d 980, 1006 (11th Cir. 2008) (citing United States v. Feola, 420 U.S. 671, 676 n.9, 95 S. Ct. 1255, 1260 n.9 (1975)). As the Supreme

4

Court has explained, "the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." Feola, 420 U.S. at 676 n.9, 95 S. Ct. at 1260 n.9.  In Feola, the defendant was convicted of violating a statute that punished assaulting a federal officer.  While the Court noted that there were instances when a fact could be more than jurisdictional, it concluded that in the statute before it the fact was indeed jurisdictional because had the prosecution been required to show the defendant knew the victim was an officer, the statute's purpose of protecting officers might well be frustrated.  420 U.S. at 684-85, 95 S. Ct. at 1264.  The Feola Court explained that its holding "poses no risk of unfairness to defendants" because "[t]he situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected." Id. at 685, 95 S. Ct. at 1264.

Several similar cases from our circuit have determined that required facts are jurisdictional and not elements of the crime.  In United States v. Campa, 529 F.3d 980 (11th Cir. 2008), we examined a statute that required the murder take place within the special maritime and territorial jurisdiction of the United States.  We noted that the statute expressly defined the mens rea requirement for murder but was silent as to jurisdiction, which indicated that the location requirement was jurisdictional alone.  529 F.3d at 1007.  In United States v. Ibarguen-Mosquera,

634 F.3d 1370 (11th Cir. 2011), defendants were captured in a stateless vessel and argued that the government was required to prove they knowingly navigated through the high seas, i.e. that this was an element of the crime of which they were convicted. Rejecting their argument, we first noted that the statute itself stated that jurisdiction was not an element of the crime, but we also held the jurisdictional requirement was not an element because the location where the crime took place had no bearing on the defendants' culpability in committing a criminal act. Id. at 1384.

Here, the requirement that the victim be American is set forth in a different subsection of the statute than the elements that are designated as punishable. See 18 U.S.C. § 1203(a), (b). The wording of the jurisdictional section also indicates that it is not meant to be an element: "It is not an offense under this section if the conduct required for the offense occurred outside the United States unless—(A) the offender or the person seized or detained is a national of the United States." § 1203(b). That language—"the conduct required for the offense"—signals that the crime has already been defined and this subsection merely provides jurisdictional requirements. Further, the conduct committed—kidnapping—would be criminal regardless of the nationality of the victim. See Ibarguen-Mosquera, 634 F.3d at 1384. Because we determine that the statute's requirement that the

6

victim be American is jurisdictional only, there is no <u>mens rea</u> requirement for that part of the statute.[1]

B. <u>Did Congress Intend to Limit the Application of § 1203 to Crimes of Terrorism, or Is the Conduct for Which Noel Was Convicted Covered by the Statute Pursuant to the Plain Meaning of the Language of the Statute?</u>

We begin, of course, with the language of the statute:

Section 1203 (Hostage taking)

(a) Except as provided in subsection (b) of this section, whoever, whether inside or outside the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person or a governmental organization to do or abstain from doing any act as an explicit or implicit condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

(b)(1) It is not an offense under this section if the conduct required for the offense occurred outside the United States unless—

(A) the offender or the person seized or detained is a national of the United States;

(B) the offender is found in the United States; or

(C) the governmental organization sought to be compelled is the Government of the United States.

(2) It is not an offense under this section if the conduct required for the offense occurred inside the United States, each alleged offender and each person seized or detained are nationals of

---

[1]     As in <u>Feola</u>, the protective effect of the statute would be undermined if the prosecution had to show that the kidnapper knew that the victim was American.  420 U.S. at 684-85, 95 S. Ct. at 1264.

the United States, and each alleged offender is found in the United States, unless the governmental organization sought to be compelled is the Government of the United States.

(c)  As used in this section, the term "national of the United States has the meaning given such term in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(22)).

18 U.S.C. § 1203.[2] We conclude that the conduct of which Noel was convicted clearly falls within the plain meaning of the statutory language:  "Whoever, whether inside or outside of the United States, seizes or detains and threatens to kill, to injure, or to continue to detain another person in order to compel a third person . . . to do . . .  any act as an explicit . . . condition for the release of the person detained, or attempts or conspires to do so, shall be punished by imprisonment for any term of years or for life . . .."  It is clear in this case that Noel "seized" and "detained" and "threatened to kill" the hostage, and demanded ransom for her release.  Moreover, because the victim, the hostage, was a citizen of the United States, she was clearly a "national of the United States" pursuant to the

---

[2]  As discussed more fully below, § 1203 implements the International Convention Against the Taking of Hostages, Dec. 17, 1979, T.I.A.S. No. 11,081 ("Treaty").  The statutory language of § 1203 describing the conduct criminalized is taken almost verbatim from the language of the Treaty, which provides in relevant part in Article 1:

1.  Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages ("hostage-taking") within the meaning of this Convention.

statutory definition,[3] and thus the crime is not excluded from coverage of the statute pursuant to § 1203(b)(1)(A).

Citing several reasons, Noel argues that Congress intended to limit the application of § 1203 to acts of terrorism.  First, Noel argues that the focus on demands to compel "a governmental organization" suggests that Congress intended to cover acts of terrorism. Although we agree that a primary focus of the statute is on acts of terrorism, the plain meaning of the statutory language encompasses not only kidnapping and ransom demands seeking to compel action of a "governmental organization," but also kidnapping and ransom demands "to compel a third person."  Nothing in the language of § 1203 suggests that the included crimes have to meet Noel's definition of terrorism.[4] The plain language of § 1203 encompasses the events for which Noel was convicted.

Noel also argues that the title "Terrorism" used in the relevant congressional legislation supports his argument that § 1203 is limited in its application to acts of terrorism.  It is true that § 1203 (captioned "Hostage taking") was added to Title 18, Chapter 55 (captioned "Kidnapping") by Chapter XX (entitled

---

[3]     The term "national of the United States" means either "a citizen of the United States" or "a person who, though not a citizen of the United States, owes permanent allegiance to the United States."  § 1203(c) (instructing use of definition in 8 U.S.C. § 1101(a)(22)).

[4]     We note that the preamble to the Treaty provides that it seeks to address "all acts of taking of hostages as manifestations of international terrorism."  We need not decide in this case the scope of the concept of terrorism, or whether Noel's crime is itself an act of terrorism. The plain language of § 1203 and the plain language of the Treaty encompass Noel's crime, without regard to whether his crime meets some definition of terrorism.

"Terrorism") of Public Law 98-473 (entitled "Comprehensive Crime Control Act of 1984"). We conclude that the use of the title "Terrorism" in the congressional legislation does not support Noel's argument. Supreme Court law is well established:

> "[T]he title of a statute . . . cannot limit the plain meaning of the text. For interpretative purposes, [it is] of use only when [it] shed[s] light on some ambiguous word or phrase."

Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 212, 118 S. Ct. 1952, 1956 (1998) (alterations in original) (quoting Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 528-29, 67 S. Ct. 1387, 1392 (1947)). There is no ambiguity in § 1203. To the contrary, as explained above, the acts for which Noel was convicted unambiguously fall within the plain meaning of the scope of § 1203.

In holding that the plain language of § 1203 includes acts of hostage taking for ransom between private parties and not involving governmental organizations, we join the position taken by every circuit court that has addressed this issue. United States v. Lue, 134 F.3d 79, 84 (2d Cir. 1998) (rejecting the argument that because § 1203 was not limited narrowly to international terrorism, it swept too broadly and thus exceeded Congress's power under the Necessary and Proper Clause); United States v. Lin, 101 F.3d 760, 765-66 (D.C. Cir. 1996) (rejecting the argument that § 1203 was never intended to cover a mere garden variety domestic kidnapping—similar to Noel's street crime argument—because the plain terms of

the statute encompassed the conduct in the case); United States v. Carrion-Caliz, 944 F.2d 220, 223 (5th Cir. 1991) (rejecting claim that alien smuggling does not fall under the Act); see also United States v. Montenegro, 231 F.3d 389, 395 (7th Cir. 2000) (adopting rationale from Lue); United States v. Lopez-Flores, 63 F.3d 1468, 1476 (9th Cir. 1995) (adopting rationale from Carrion-Caliz).

Thus, neither Noel's first argument—that the prosecution was required to prove that he knew his victim was an American citizen—nor his second argument—that Congress intended to limit the application of § 1203 to acts of terrorism—have merit. However, Noel incorporates both his lack of knowledge and the nature of his crime as part of his due process argument. We turn now to that constitutional argument.

## C. Noel's Constitutional Challenge

Noel argues that application of § 1203 to the conduct for which he was convicted violates due process. For the following reasons, he argues that he could not be expected to have been on notice that he could be haled into a United States court. He contends that he did not know that his victim was a United States citizen and he argues that the nature of his crime—i.e., not being what he would classify as an act of terrorism—did not put him on notice that a foreign jurisdiction could hale him into a foreign court.

11

The law is well established that, for a statute to be given exterritorial effect, two requirements must be met. First, Congress must clearly state that it intends the law to have extraterritorial effect. United States v. Ibarguen-Mosquera, 634 F.3d 1370, 1378 (11th Cir. 2011). Second, the extraterritorial application of the law must comport with due process, meaning that the application of the law must not be arbitrary or fundamentally unfair. Id.

We readily conclude that § 1203 very clearly satisfies the first requirement—i.e., Congress made absolutely clear its intention that § 1203 should have extraterritorial application when the person seized or detained is a citizen of the United States. Section 1203(a) expressly provides that it applies "whether [the offense occurs] inside or outside the United States." And § 1203(b)(1)(A) and (c) expressly provide that when the "person seized or detained" is a citizen of the United States, § 1203(a) applies even when the offense occurs "outside the United States." Because the hostage in this case was a citizen of the United States, it is clear that § 1203 does apply, and that Congress expressly intended this extraterritorial jurisdiction.

Before turning to the second requirement to satisfy due process—the notions of notice and fundamental fairness—we address Noel's argument that, even if Congress clearly intended § 1203 to have extraterritorial reach, Congress did not have the power to criminalize conduct of Noel's kind and location of his crime (the

12

"empowerment argument").  His crime, he argues, was a private crime (i.e., not an act of terrorism and not affecting the United States in any way) committed by a Haitian national and committed entirely in Haiti.   He argues that the only possible enumerated power in the Constitution for such a provision would be the Offences Clause.  That clause provides that Congress shall have the power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations."  U.S. Const. Art. I, § 8, cl.10.  He argues that his offense was not piracy, was not committed on the high seas, and could not be deemed an offense against the Law of Nations, and thus the Offences Clause cannot provide a viable constitutional basis for the application of § 1203 to his case.   In support of this argument, Noel relies upon our decision in United States v. Bellaizac-Hurtado, 700 F.3d 1245, 1252 (11th Cir. 2012), which held that "[p]rivate criminal activity will rarely be considered a violation of customary international law."

We conclude that Noel's empowerment argument is without merit.  Our decision in United States v. Ferreira, 275 F.3d 1020 (11th Cir. 2001), squarely holds that § 1203 is well within the power of Congress to enact.  In Ferreira, this court squarely addressed and rejected this same empowerment argument.   Ferreira held in relevant part:

> Appellants also suggest that Congress lacked the authority under any of its constitutionally enumerated powers to enact the Hostage Taking Act, whether that power derives from the Commerce Clause, the Law of Nations Clause, or from its broad power to regulate immigration

13

and naturalization. Those arguments, however, are misplaced. The Hostage Taking Act was passed in order to implement the International Convention Against the Taking of Hostages, and thus congressional authority may be found in the Necessary and Proper Clause.

The Necessary and Proper Clause provides that "Congress shall have Power . . . [t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const., art I, § 8. As the Second Circuit noted in Lue, because "Congress's authority under the Necessary and Proper Clause extends beyond those powers specifically enumerated in Article I, section 8 [, it] may enact laws necessary to effectuate the treaty power, enumerated in Article II of the Constitution." Lue, 134 F.3d at 82 (citing Missouri v. Holland, 252 U.S. 416, 432, 40 S. Ct. 382, 383, 64 L. Ed. 641 (1920); Neely v. Henkel, 180 U.S. 109, 121, 21 S. Ct. 302, 306, 45 L. Ed. 448 (1901)). Thus, "[i]f the Hostage Taking Convention is a valid exercise of the Executive's treaty power, there is little room to dispute that the legislation passed to effectuate the treaty is valid under the Necessary and Proper Clause." Id. at 84 (citing Holland, 252 U.S. at 432, 40 S. Ct. at 383, for the proposition that, under normal circumstances, "[i]f the treaty is valid there can be no dispute about the validity of [a] statute [passed] under Article I, Section 8, as a necessary and proper means to execute the powers of the Government").

We agree with the Second Circuit's analysis and conclusion that "the Hostage Taking Convention is well within the boundaries of the Constitution's treaty power," id. at 83, and similarly conclude that Congress had authority under the Necessary and Proper Clause to enact the Hostage Taking Act.

275 F.3d at 1027-28.  Ferreira established that Congress had the power to enact

§ 1203 pursuant to the Necessary and Proper Clause and the Treaty Power.  Accord

United States v. Mikhel, 889 F.3d 1003, 1023-24 (9th Cir. 2018); United States v.

Shibin, 722 F.3d 233, 247 (4th Cir. 2013); Lue, 134 F.3d at 82.  Thus, even if Noel

14

is correct that his crime could not be deemed an offense against the Law of Nations—an issue we need not decide—Ferreira explains that § 1203 nevertheless falls well within the enumerated powers of Congress.

Similar to the defendant in United States v. Baston, 818 F.3d 651 (11th Cir. 2016), Noel mistakenly reads Bellaizac-Hurtado as holding that Congress's power to enact extraterritorial laws is limited to the Offences Clause.  In Baston, we held that "[c]ontrary to Baston's argument, this Court has upheld extraterritorial criminal laws under provisions of Article I other than the Offences Clause."  Id. at 667.  We expressly rejected Noel's very argument:

> Congress's power to enact extraterritorial laws is not limited to the Offences Clause.  Baston misreads our decision in United States v. Bellaizac-Hurtado, 700 F.3d 1245 (11th Cir. 2012), where we held that the Maritime Drug Law Enforcement Act, as applied to extraterritorial drug trafficking, exceeded Congress's authority under the Offences Clause.  Id. at 1247.  We did not hold that the Offences Clause is the *only* power that can support an extraterritorial criminal law; our decision was limited to the Offences Clause because the government failed to offer "any alternative ground upon which the Act could be sustained as constitutional."  Id. at 1258.

Baston, 818 F.3d at 666-67 (emphasis in original).

Having rejected Noel's empowerment argument, we now turn to consider Noel's contention that the exercise of extraterritorial jurisdiction in his case violates his due process protections against an arbitrary and fundamentally unfair application of the statute.  "The Due Process Clause prohibits the exercise of extraterritorial jurisdiction over a defendant when it would be 'arbitrary or

15

fundamentally unfair.'"  Baston, 818 F.3d at 669 (quoting Ibarguen-Mosquera, 634 F.3d at 1378).  "Compliance with international law satisfies due process because it puts a defendant 'on notice' that he could be subjected to the jurisdiction of the United States."  Id.

In United States v. Ali, 718 F.3d 929 (D.C. Cir. 2013), the court addressed the same due process concern raised by Noel.  The Ali case also involved a prosecution under § 1203 of a defendant whose "involvement was limited to acts he committed on land and in territorial waters [off Somalia]—not upon the high seas."  Id. at 932.  Addressing the concerns of due process and extraterritorial conduct, and recognizing that a United States court should exert jurisdiction "only over a defendant who should reasonably anticipate being haled into court in this country," the court held that the International Convention Against the Taking of Hostages provided "global notice that certain generally condemned acts are subject to prosecution by any party to the treaty."  Id. at 944.  The Ali court held:

> Whatever due process requires here, the Hostage Taking Convention suffices by "expressly provid[ing] foreign offenders with notice that their conduct will be prosecuted by any state signatory."

Id. at 945 (alteration in original) (quoting United States v. Shi, 525 F.3d 709, 723 (9th Cir. 2008)).

In so holding, the D.C. Circuit in Ali was following an alternative holding in United States v. Shi, 525 F.3d 709, 723 (9th Cir. 2008).  There, a Taiwanese

16

fishing vessel, registered in the Republic of Seychelles, was sailing in international waters off the coast of Hawaii when the ship's cook, Shi, murdered the Captain of the ship and the First Mate in retaliation for their having beaten him. The Captain was Taiwanese; Shi and the 29 crew members were Chinese.  After the murders, Shi took control of the ship.  In response to a call for help from the ship's owner, the United States Coast Guard intercepted the ship 60 miles from Hawaii, and the Republic of Seychelles waived jurisdiction.  Id. at 718.  Shi was arrested and eventually prosecuted in the United States.  Id. at 719.  He was charged with violations of 18 U.S.C. § 2280, a statute enacted to implement the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation (the "Maritime Safety Convention").  The Convention authorizes any signatory state to prosecute offenders, regardless of where the offender's acts occurred.  Id. Accordingly, § 2280 authorizes federal jurisdiction over any offender later "found" in the United States after a prohibited act is committed.  Id. at 719-20.  The Ninth Circuit held that the statute constituted a clear expression of congressional intent to apply to crimes that occurred outside of the United States—i.e., a clear expression of congressional intent to apply extraterritorially.  Id. at 721-22.  The Shi court held:

> In addition to the Offense Clause, Congress derived the authority to promulgate § 2280 by virtue of the Necessary and Proper Clause. That Clause empowers Congress "to make all Laws which shall be necessary and proper for carrying into execution  . . . all other  Powers

vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. Such "Powers" include the Executive's Article II Treaty Power. See Missouri v. Holland, 252 U.S. 416, 432, 40 S. Ct. 382, 64 L. Ed. 641 (1920). Section 2280 implements the Maritime Safety Convention, an international accord which requires signatory states to "prosecute or extradite" offenders found within their territory regardless of where the offense was committed. . . . In order to satisfy this obligation, it was necessary for the United States to codify the Convention's "extradite or prosecute" requirement into federal law. Section 2280 accomplishes this task. Accordingly, the Treaty Power coupled with the Necessary and Proper Clause provided Congress with an additional source of authority to apply § 2280 beyond U.S. borders.

Id. at 721. The Shi court then addressed defendant's argument that the application of the statute to him violated due process. Id. at 722. The court held: "The Due Process Clause requires that a defendant prosecuted in the United States should reasonably anticipate being haled into court in this country." Id. (internal quotations omitted). In an alternative holding, the court held:

Moreover, due process does not require the same nexus between violators of § 2280 and the United States because § 2280 implements the Maritime Safety Convention, which expressly provides foreign offenders with notice that their conduct will be prosecuted by any state signatory.

Id. at 723; accord United States v. Murillo, 826 F.3d 152, 158 (4th Cir. 2016) (similarly holding that a different treaty provided such global notice: "supported by decisions of our sister circuits, including Ali and Shi, that global notice alone is sufficient to quell any concern that Bello's prosecution in the United States for his crimes against Agent Watson contravened due process.").

18

We agree with our sister circuits—the Fourth, the Ninth and the D.C. Circuits—that the Treaty provides global notice to the world that the hostage taking criminalized by § 1203 can be prosecuted in any signatory nation of which the hostage is a citizen or a national, notwithstanding that the crime occurred elsewhere.  The Treaty expressly provides:

> 1.  Each State Party shall take such measures as may be necessary to establish its jurisdiction over any of the offences set forth in article 1 which are committed:
> . . . .
>
> (d)  With respect to a hostage who is a national of that State, if that State considers it appropriate.

Treaty, Article V, § 1(d).[5]

Both the United States and Haiti are signatories of the Treaty.  His own country having signed the Treaty, the global notice of the Treaty clearly extends to Noel.[6]

Noel argues that such global notice, by itself, is not sufficient to satisfy due process concerns.  He argues that there must also be a significant interest on the part of the United States; the mere fact that the hostage was a citizen of the United

---

[5]    See also Treaty Art. X, § 4, which provides:

The offences set forth in article 1 shall be treated for the purpose of extradition between State Parties, as if they had been committed not only in the place in which they occurred but also in the territories of the States required to establish their jurisdiction in accordance with paragraph 1 of article 5.

[6]    We note that the D.C. Circuit in Ali, 718 F.3d at 945, held that this Hostage Treaty provided such global notice satisfying due process concerns notwithstanding the fact that the offender was a national of Somalia, which was not a signatory nation.

States, he argues, is not sufficiently significant.  Contrary to Noel's argument, the Fourth Circuit in Murillo, 826 F.3d at 158, the D.C. Circuit in Ali, 718 F.3d at 945, and the Ninth Circuit in Shi, 525 F.3d at 723, have all held that such global notice, by itself, does satisfy due process concerns where a crime is universally condemned. Shi, 525 F.3d at 724 ("Because piracy is a universally-condemned crime, a jurisdictional nexus is not required to satisfy due process."); Ali, 718 F.3d at 944 ("the treaty at issue in Shi did what the International Convention Against the Taking of Hostages does here: provide global notice that certain generally condemned acts are subject to prosecution by any party to the treaty."); see also Restatement (Third) of Foreign Relations § 404 ("A state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern").  For the following reasons, we need not decide in this case whether the global notice provided by the Treaty is sufficient by itself to satisfy due process concerns. Assuming arguendo that some significant state interest in addition to such global notice is required, we believe the fact that the hostage was a United States citizen satisfies any such requirement.  Protection of our own citizens abroad is obviously an important interest of the United States. And protection from the crime of being taken as a hostage abroad is a significant interest. The United States has clearly expressed this significant interest in signing the Treaty, and in passing the legislation, § 1203, to implement the Treaty.  The

20

preamble of the Treaty provides that "the taking of hostages is an offence of grave concern to the international community." Both the Treaty and § 1203 expressly provide for the exercise of extraterritorial jurisdiction over the crime of hostage taking when the hostage is a citizen or national of the United States.

Thus, we conclude that both Noel's empowerment argument and his due process argument are without merit.

### III.    CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.